UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

UNITED STATES OF AMERICA,            )
      Government,                    )
                                 )
VS.                                  )   CAUSE NO. 2:24-CR-045-Z-BR-1
                                     )
COLE PATRICK UNDERWOOD,              )
      Defendant.                     )

--------------------------------------------------------

SENTENCING HEARING
BEFORE THE HONORABLE MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE

FEBRUARY 11, 2025
AMARILLO, TEXAS

--------------------------------------------------------

A P P E A R A N C E S

FOR THE GOVERNMENT:
UNITED STATES ATTORNEY'S OFFICE
1205 TEXAS AVENUE, SUITE 700
LUBBOCK, TEXAS 79401
BY:  CALLIE WOOLAM

FOR THE DEFENDANT:
BETHANY STEPHENS
ATTORNEY AT LAW
P.O. BOX 75
CHILDRESS, TEXAS 79201

FEDERAL OFFICIAL COURT REPORTER: MECHELLE DANIEL, 1205 TEXAS
AVENUE, LUBBOCK, TEXAS 79401, (806) 744-7667.

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY; TRANSCRIPT
PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.

<u>INDEX</u>

COURT'S ANNOUNCEMENT OF TENTATIVE DETERMINATION ON
COURT'S MOTION FOR UPWARD VARIANCE........................ 3,39

VICTIM IMPACT STATEMENT BY C.U........................... 12

EXHIBIT "A" ADMITTED..................................... 20

VICTIM IMPACT STATEMENT BY N.J........................... 21

EXHIBIT "B" ADMITTED..................................... 27

CHARACTER STATEMENT BY BILLY UNDERWOOD................... 29

CHARACTER STATEMENT BY LORI HUNNICUTT-HAYES.............. 32

EXHIBIT "C" ADMITTED..................................... 35

CHARACTER STATEMENT BY LYNDA UNDERWOOD................... 36

EXHIBIT "D" ADMITTED..................................... 38

GOVERNMENT'S SENTENCING EVIDENCE/ARGUMENT............... 50

DEFENDANT'S SENTENCING EVIDENCE/ARGUMENT............... 54

ALLOCUTION............................................... 63

COURT'S FINAL FINDING ON COURT'S MOTION FOR
UPWARD VARIANCE......................................... 64

SENTENCE BY THE COURT.................................... 67

COURT'S STATEMENT OF REASONS............................ 72

RIGHT TO APPEAL......................................... 76

EXHIBIT "E" ADMITTED.................................... 79

REPORTER'S CERTIFICATE.................................. 80

* * * * *

P R O C E E D I N G S

THE COURT:  The Court calls Criminal Action Number 2:24-CR-045-Z-BR-1, United States of America vs. Cole Patrick Underwood, for sentencing.

Are the parties ready to proceed?

MS. WOOLAM:  Good morning, Your Honor.  Callie Woolam on behalf of the United States, and we are ready to proceed.

MS. STEPHENS:  Bethany Stephens for the defense.  We're ready to proceed.

THE COURT:  Counsel for the United States is present.  Counsel for the defendant, Cole Patrick Underwood, is present.

Mr. Underwood, please state your full name for the record to acknowledge your presence in court today.

THE DEFENDANT:  Cole Patrick Underwood.

THE COURT:  From this point forward, you may participate in this hearing seated or standing, whatever is most comfortable and consistent with the advice of counsel.

Now, before we proceed with sentencing, the Court will make an announcement of its tentative determination on upward variance, and then we'll proceed according to plan.

So, based on the information contained in the presentence report, the addenda, and the victim impact statements, this Court has tentatively determined that a

nonguidelines upward variance to a term of imprisonment of 360 months, followed by a term of release--or supervised release of life, is sufficient, but not greater than necessary, pursuant to the factors set forth at 18 U.S.C. Section 3553(a).

This is a tentative determination.  And, as counsel are well aware, the Fifth Circuit has expressly held that, quote, sentencing courts are not required to give presentencing notice of their sua sponte intention to impose nonguidelines variance.  The Court stated this in *United States vs. Mejia-Huerta*.

But this Court provided this tentative determination in the form of an announcement to allow Defendant a full and adequate opportunity to object to the upward variance.  And the time for those arguments is after the Court announces its 3553(a) factor-by-factor weighting, and then I'll invite argument both from the government and the defendant.

Now, Mr. Underwood, you appeared before United States Magistrate Judge Lee Ann Reno on October 10, 2024.  At that time, you entered a plea of guilty to Count 1 of the indictment charging you with Enticement and Attempted Enticement of a Minor, in violation of 18 U.S.C. Section 2422(b).

On that date, Magistrate Judge Reno found that your guilty plea was knowledgeable and voluntary and that it was supported by an independent basis in fact containing each of

the essential elements of the offense.  You told Judge Reno that you understood the elements of the offense; you agreed to the accuracy of the factual resumé; and you admitted that you committed all essential elements of that offense.

Accordingly, on October 25th, 2024, this Court entered an order accepting your plea and adjudging you guilty of the crime alleged in the indictment.

Now, this plea of guilty was entered pursuant to a written plea agreement, a written factual resumé, and a plea agreement supplement.  And, pursuant to Section 6B1.2(a) and Rule 11(c)(1)(A), this Court has reviewed your plea agreement, the factual resumé, the indictment, and the undisputed facts set forth in your PSR and thereby determined that the remaining charge does adequately reflect the seriousness of your actual offense behavior, so that accepting your plea agreement will not undermine the statutory purposes of sentencing or the sentencing guidelines, all relevant conduct having been taken into consideration in calculating the total offense level.

For those reasons and consistent with Rule 11(c)(4), this Court accepts your plea agreement, and judgment and sentence will be consistent with it.

So let's turn next to the presentence report, the addendum, and the second addendum that followed.

Ms. Woolam, did you and the government receive a timely copy of the PSR and addenda?

MS. WOOLAM:  Yes, Your Honor.

THE COURT:  And, here, the government filed timely responses in Documents Number 46 and 51.  Does the government have any additional information responsive to the PSR or addenda?

MS. WOOLAM:  No, Your Honor.

THE COURT:  Does the government adopt the facts and conclusions set forth in the PSR and addenda?

MS. WOOLAM:  Yes, Your Honor.

THE COURT:  Now, Ms. Stephens, did you and your client receive a timely copy of the PSR and the addenda that followed?

MS. STEPHENS:  Yes, Your Honor.

THE COURT:  Did you have a full and complete opportunity to review the PSR, the addendum, and the second addendum with your client?

MS. STEPHENS:  Yes, Your Honor.

THE COURT:  And did you explain to your client how the PSR and addenda work in the sentencing hearing?

MS. STEPHENS:  Yes, Your Honor.

THE COURT:  Are you confident that your client understands every word, sentence, and paragraph of the PSR, as modified by those addenda?

MS. STEPHENS:  Yes, Your Honor.

THE COURT:  Here, Defendant and defense counsel

timely filed Objections Number 1 and 2 seeking factual clarifications that are arguably mooted by the second addendum.

Does Defendant agree with the Court that the second addendum corrected the information discussed in Objections 1 and 2, thereby rendering them moot?

MS. STEPHENS:  Yes, Your Honor.

THE COURT:  And does Defendant have any untimely objections, responses, or requested clarifications relevant to the PSR or addenda?

MS. STEPHENS:  No, Your Honor.

THE COURT:  Does the defendant adopt the facts and conclusions set forth in the PSR, as modified by the addenda?

MS. STEPHENS:  Yes, Your Honor.

THE COURT:  So let's turn next to acceptance of responsibility.  Pursuant to Section 3E1.1(b), this defendant may qualify for a one-level deduction upon motion of the government if he timely assisted authorities in the investigation of his own misconduct and timely noticed his intent to plead guilty.

Here, PSR paragraph 27 reflects that the defendant did both.

Does the government move this Court to grant the one-level deduction for acceptance of responsibility?

MS. WOOLAM:  Yes, Your Honor, the government so moves.

THE COURT:  The Court grants the government's motion and will apply the third point for acceptance of responsibility in calculating the advisory guidelines range.

The Court having confirmed with Defendant that the second addendum mooted Objections 1 and 2 and the Court agreeing that those are now moot, this Court adopts the findings and conclusions of the PSR and the addendum in their entirety.

So let's turn to the calculation of the advisory guidelines range, which must serve as our starting point.  So, here, the Court is applying the relevant federal statutes and the 2024 guidelines manual.

Ms. Stephens, this Court compared this newer 2024 guidelines manual with those in effect on the date of the instant offense of conviction and thereby determined that use of this newer 2024 manual will not violate the ex post facto clause of the Constitution or any other right of Defendant.  Do you agree that this Court should use and apply the 2024 guidelines manual?

MS. STEPHENS:  Yes, Your Honor.

THE COURT:  Does the government agree?

MS. WOOLAM:  Yes, Your Honor.

THE COURT:  The Court will use and apply the newer 2024 guidelines manual.

But before calculating and announcing the advisory

guidelines range, the Court will note the considerable impact of the plea agreement in this case and statutory maximums that could have applied but for that plea agreement.  And these maximums are noted in the presentence report.

Here, Defendant could have faced an additional maximum sentence of 20 years' imprisonment had he been convicted on Count 2 in the indictment.  Additionally, a Total Offense Level of 41 and a Criminal History Category of I could have generated an advisory guidelines range of 324 months to 405 months.

So this Court finds that defense counsel capably and effectively negotiated a plea agreement that significantly reduced Defendant's sentencing exposure.

Having considered the probation officer's calculations and conclusions in the PSR and addenda and there being no objections, this Court adopts the probation officer's calculations and conclusions and thereby determines that the correct advisory guidelines range is as follows:

A Total Offense Level of 38; a Criminal History Category of I; an imprisonment range of 235 to 293 months; a supervised release range of 5 years to life; a fine range of $50,000 up to $250,000; and restitution in the amount of $5,000.

Understanding that this Court will next adjudicate its tentative determination on an upward variance, does the

government have any objections to the Court's calculation of the advisory guidelines range, which must serve as our starting point?

MS. WOOLAM:  No, Your Honor.

THE COURT:  Does the defendant have any objections to the Court's calculation of the advisory guidelines range, which must serve as our starting point?

MS. STEPHENS:  No, Your Honor.

THE COURT:  The Court will start with that advisory guidelines range.  And I'll turn next to statements.

So before the Court fully adjudicates its own motion for upward variance, the Court will give both the government an opportunity to present victim impact statements and the defendant an opportunity to present his character statements in live testimony.

So, here, several character statements and victim impact statements are already filed with the court.  Specific to the government, this Court is in receipt and has reviewed victim impact statements from the identified victim, as well as a person identified as C.U.

So does the government intend to present any of these victim impact statements through live testimony?

MS. WOOLAM:  Your Honor, both individuals, N.J. and C.U., intend to make victim impact statements in person here today.

THE COURT:  Okay.  So for purposes of further appellate review, I will ask that every person presenting a victim impact statement or character statement be sworn.

And so, Ms. Woolam, you may present your first victim impact statement.  And I want to clarify for the record, I believe I have a written statement from the identified victim, but I don't have a written statement from Ms. Underwood.  Is that correct?

MS. WOOLAM:  That is correct, Your Honor.

THE COURT:  Okay.  So let's do it this way.  For any persons testifying through live testimony and consistent with the victim impact reporting requirements, we'll place them under oath.

So you may call your first victim impact statement.

MS. WOOLAM:  Yes, Your Honor.  That would be C.U.

THE COURT:  Ms. U., you may approach the podium.  And I just ask that you start with a statement of your full name so we can record your presence here today.

C.U.:  My name is C.U.

THE COURT:  Okay.  And I'll ask that you raise your right hand.  My courtroom deputy will administer the oath.

(THE OATH IS ADMINISTERED BY THE COURTROOM DEPUTY)

THE COURT:  You may proceed, and you may take as much time as necessary.

C.U.:  I know this case is about the child that will be speaking next, but I would like to tell the Court about the sexual abuse I suffered at Cole's hands throughout my childhood.  I know this Court is not aware of all the facts of my sexual abuse, and I won't detail them today.  But, in short, Cole sexually abused me for years, from fifth grade to my freshman year of high school.

Oftentimes when I think of my childhood, I think of all the people who were envious of our lives.  We had everything.  We never wanted for anything.  We vacationed.  We lived a childhood that so many wanted.  We had the typical American dream family--  I'm sorry.

THE COURT:  You can take as much time as you need.

C.U.:  Other times when I think of my childhood, I must stop myself because of what Cole did to me for years.  In reality, no one would be envious of what I endured behind closed doors.

I could have had a brother, and Cole ripped that from me.  I could have been an aunt, and that's no longer a maintainable dream.  I could have maintained my innocence, and Cole also ripped that from me.

Cole relished in the fact that he was the golden child.  People thought of me as the wild child, the rule-breaker, the mean one.  Definitely not Cole, the golden child.  However, what they never understood is why I acted out

and what Cole was doing to me behind closed doors. It didn't matter if it were my room, Cole's room that he called me to, the bathroom we shared, or the room at Grand's we shared as children when Dad and Lynda were away. Cole took what he wanted when he wanted it, and the repercussions never crossed his mind.

Some may say he didn't know better; he was a kid. But he is three years older than me and fully knew what he was doing was wrong, so he blamed it on a youth porn addiction that followed him into adulthood, after I finally confronted him all those years later. The issue is, most porn addicts don't abuse their sisters, much less for the extended time frame that I endured.

I knew what Cole was doing was wrong, but no one would have believed the golden child could do such a thing, not until now. I truly believe Cole thought he would not get punished for this crime, like he was never punished for abusing me. I think others are still trying to rationalize Cole's relationship with a child by saying he believed he was in love. But that's why I want to share my story about Cole's manipulation and sexual abuse of me.

Cole's gift for the gab has allowed him to manipulate people for the entirety of his 29 years on earth. I'm sure some are still fooled by the tears and apologies. They'll never admit that the apologies are strictly because he

got caught, not genuine sorrow for his actions.

My whole life, I had to deal with the abuse, as well as knowing that if I told someone what Cole did to me, I would be blamed for destroying our family or someone might not believe me.  I couldn't bear the blame, and I still fear being not believed.

Imagine the pain I felt every day growing up, acting as if we were normal siblings.  I suffered silently while having to cheer on Cole at various events and pose in pictures.  I made it my mission from a very young age to never let anyone know that I was dying inside.  I never once faulted in my sibling duties, while silently dealing with the pain that Cole caused.  I hate that I convinced myself I had to act like we were normal siblings at a very young age.

Imagine the--imagine the anger I feel every time our mother Lynda calls me a lesbian because I never have a boyfriend.  But it's because of Cole that I have a hard time trusting boys, no matter how badly I want to.  I wish more than anything Cole didn't mess me up so terribly, that I could trust and let men in my life.  I will have to cope with the damage that Cole caused forever.  And I wish more than anything I wasn't here right now.  But we are here today because of him.

I hold immense resentment of every single person that put Cole on a pedestal to this day.  I am aware of the individuals who submitted letters on his behalf, because the

prosecutor asked me questions about the relationship those individuals have to our family.  Prominent people of Amarillo's hierarchy--a congressman's spouse, Amarillo business owners, and Amarillo police personnel and coaches--each of those 14 people who wrote letters telling this Court what a great person Cole is has no idea who and what they have put their name behind.  Unfortunately, our family members who wrote on Cole's behalf do know what he did to me, but they don't care.

In regards to the people who wrote letters in support of Cole, I want to say what a disheartening disgrace it is to know they are the type of people to defend and make excuses for a convicted pedophile.  It is truly disgusting that these people are the people who hold status around various parts of Texas and Amarillo.  Love him, of course.  But do not defend him.

When I was twenty-four, shaking with unbearable anxiety about Cole's upcoming wedding, I finally told someone what he did to me.  A brother's wedding and gaining a sister is something every little girl dreams of, but I dreaded that day. I didn't want to be in a room with him.  I couldn't fake happiness or normalcy any longer.

I have never been able to tell the people the reason that I'm not close with my brother is because he sexually abused me.  And I still struggle feeling that some people do not believe me, despite having an admission from Cole

in writing and text messages proving it.  It's sad feeling like I must prove this abuse and fight this argument alone because Cole is such a good liar.

I have worked so hard to overcome what's happened to me, and I never wanted this to overshadow what work I've done on myself alone.  I also fear telling people because I did not want to be pitied.  I am strong, and I did not want pity. I want to be known for being strong and being empowering, not the little girl who was abused by her brother.

After this investigation began, Cole called me one single time to apologize for the fact that what he did to this child was likely to become public.  He did not apologize for what he did to me or what he did to this child, simply sorry for the sole fact people were going to publicly know my brother was a monster.  I've known that.

Two young girls must suffer the repercussions of Cole's actions.  I am old enough to know the damage Cole caused.  I am clinically diagnosed with severe PTSD and depression.  I can't even make it through back-to-back weeks of EMDR right now.

My PTSD and depression stem from fifth grade when Cole started.  Cole did this to me, and I hate that Cole's actions have broken me to this day.  I have worked and I will continue to work every single day to overcome what Cole did to me, and I will for the rest of my life.

The other child Cole abused is so young and naive to think that this was love.  This wasn't love.  This was grooming and manipulation for predatory sexual desires.  In a few years, she, too, will understood how Cole's actions will impact her future life.  Cole stole her innocence as he did mine.  Cole promised her a life she knew she couldn't have.  That is not love.  That is textbook grooming via love-bombing a child in order to manipulate her to do the things that he desired.

I want to hate Cole, and I do, but not for the reasons some may think.  I hate Cole because Cole continues to blame me for his crimes.  I keep having to remind myself that, through the noise, this isn't my fault and I didn't do that, and I most definitely didn't turn him in, although I should have ten years ago.  I kept my word.  Cole did not.

I hate Cole because he fooled me and my dad again.  Cole is a diabolical mastermind.  He told us this would never happen again and he was actively seeking help.  I hate him for the guilt I now have to live with.  It makes me sick that my silence and my own self-preservation allowed him to target another child.

From administrative leave at Amarillo High to Perryton, Cole was given ample warnings to stay away from children, and he simply could not control his perversions.  His freedom has been stripped, rightfully.  But so has ours.  I

have no choice but to stand up for what is right this time around, because I cannot defend and enable Cole's actions as some still do.

That leads us to today.  Today, I choose to speak up for what is right and not hide behind my fear of judgment or my fears of safety.  I'm terrified to be here, but I will choose time and time again to stand up and speak for the little girls who do not have the strength to do so.  I must stand up for the little girls who don't have someone to speak for them.

I am speaking today for me, a little girl who was once too scared to tell anyone until she was twenty-four.  I stand here speaking up for myself because no one else will.  And that, Cole can blame on me, but only that.  Maybe my persistent advocation today stems from a little girl who dreamed of this type of advocation.

Cole has destroyed more people than he can even begin to imagine.  He hid behind a new phone number while we got the brunt of the media coverage.  This wasn't a one-time mistake.  This was a conscious act twelve times over involving crypted apps, meticulously planned meet-ups in his office, a hidden phone while he was out on bail, and a coerced letter to Lynda; a revolting statement saying that this was God's divine plan.  No sorrow, no regrets; just a statement saying this was in the cards for Cole, then use our sweet late grandparents as an example to try to make this okay.  This will never be okay.

Cole has destroyed me time and time again.

In addition to the wreckage Cole has caused, I would also like to address the fact that we both chose career paths involving working with children and protecting them. As a nurse, I choose to stand by my protection and advocation of children when they are in the ICU and in their most vulnerable state. Cole chose to take the pure and vulnerable population of high school girls and weaponize his power as an administrator for his own selfish actions time and time again.

This experience has altered my life in a way that words can scarcely convey, and has probably altered this next child as well. Forgiveness is warranted, but I must work the rest of my life in hopes to forget. I trust the judgment today will be honorable and ensure the safety and well-being of others, as well as the possibility of reoffense.

The purpose of my appearance today is not because I want you to lengthen my brother's sentence or because I hate my brother. I certainly do not read out of spite. I simply read from a hole in my heart that needed help healing. I also speak today to remain on the right side of this. His actions are of those that I cannot change, nor would I ever defend, as I was affected too. I pray he finds help while he's inside, because God knows he needs it.

Thank you.

THE COURT: And, Ms. U., do you have any objection

to the Court retaining a copy, marked as Exhibit A, for the record in this case and any appellate review?

C.U.:  I have one for you.

THE COURT:  Okay.  So any objection, Ms. Stephens, to marking the written version of Ms. U.'s victim impact statement as Exhibit A to this sentencing hearing?

MS. STEPHENS:  No, Your Honor.

THE COURT:  Okay.  It is so admitted.  It will be so marked.

So, Ms. Woolam, you may present Exhibit A.  That will be made part of the record in this case and in any record on appeal.

Ms. U., the Court will give appropriate weight to your victim impact statement, and you may return to the gallery.

Ms. Woolam, are you calling a second victim impact statement or relying on PSR paragraph 24, as modified by the addenda?

MS. WOOLAM:  Your Honor, we would call Ms. N.J. to make an in-person victim impact statement.  It is slightly different than what is included in the presentence report.

THE COURT:  Okay.  Ma'am, you may approach the center podium.  I ask that you start with a statement of your full name to acknowledge your presence in court today.  And I

ask that you raise your right hand.  My courtroom deputy will administer the oath.

(THE OATH IS ADMINISTERED BY THE COURTROOM DEPUTY)

THE COURT:  You may proceed, and you may take as much time as you need.

N.J.:  N.J.

I am a 16-year-old girl who was the victim of sexual assault by Cole Underwood when I was fifteen.  I am still discovering all the ways that what has happened to me is continuing to affect me in my everyday life.  While I have managed to not fall off course with my life, I continue to question why I was the chosen victim for the crime that has occurred and absolutely torn my life apart.

When I first met Cole, I had no interest in him.  He seemed arrogant and rude.  At the time, I was struggling in my personal life with family matters.  I was very good at hiding it, but Cole knew what to look for in hurting girls and saw right through the mask that I had put up.  He gradually started to break down my walls by making sure I was okay and checking in when he noticed I didn't seem as happy as normal. I had no idea that he was slowly in the process of grooming me. I genuinely thought he actually cared about me.

Since this time, trusting that people truly care about my well-being has been extremely difficult.  At first, he started by telling me I could always confide in him with my

personal life, that he would always try his very best to help me in any way he could, and that his door was always open.  I see now that if he truly wanted to help me, he would have never done the things that he did to me, and he would have actually tried to get me the real help that I needed.

I remember thinking things were getting weird between the two of us, yet I didn't know how to stop it.  It felt like no one would believe me because of how much power he held over me.

When things really started to change between us, I began getting scared in the way his treatment towards me had shifted.  I could never do anything right.  Every day, I felt like there was always something that I was doing wrong.  He would get upset, and I could tell my mental health was progressively getting worse from it.

He convinced me to shut everyone out, even my closest friends.  I felt like I seriously had no one but him to talk to and was so isolated.  To this day, I get paranoid when talking to some people, because I feel like I'm going to do something wrong and someone will get upset with me.

When the sexual interactions began, I remember telling Cole no, that I was scared and was not mentally or physically ready for what he was asking me to do.  Even after countless times of me saying "no," he continued to beg and bring up the topic.  The day he took my innocence, I cried when

asked to perform sexual intercourse and wanted to leave his office, but instead, he put his arms around me and told me it was okay; if I wasn't ready, that he would wait.  In my head, I began to think maybe me saying "no" had finally gotten through to him, but I was wrong, because not even ten minutes later, he was already asking again.  I felt obligated to just say "yes" because I was getting annoyed he would not take "no" for an answer.  I walked out of his office that day feeling hurt by someone I thought I could trust, and I now struggle to tell people "no" because of how little my voice truly mattered to Cole.

There's a lot I can't remember about the week when Cole was first arrested.  The one thing I do remember, though, is, it has changed my life forever.  The stress I was under is something I had never experienced.  I went from being liked by most to being the girl that everyone whispered about and pointed at in the hallways.  As bad as I wanted to let it all consume me by staying home and letting it eat me alive, I knew I couldn't do that.  And I knew I was stronger than that, and I genuinely just wanted to prove that.  Little did I know, as I was trying to heal, Cole was trying every way to still have a grasp of me.

Knowing I was in the worst mental state ever, he clawed his way back into my life as if he hadn't already ruined it enough.  Talking to him wasn't what it had been before.

Deep down, I didn't want to talk to him, because I knew the consequences that would come would be terrible.  And I was unknowingly righter than I would have ever thought.

When Cole was rearrested by the FBI, my life crumbled.  I was completely exposed by the media, and I never wanted to show my face ever again.  When thinking about what has happened to me, I truly get disgusted by the way I was completely manipulated and taken advantage of.

This is something I swore up and down would never happen to me, until it did.  I never realized how manipulation was really a real thing, and I always thought that I would be able to say "no."  But you don't realize how far you are in a situation until it feels like there is no way out.

During this dark period of my life, I struggled to see the good in anything.  There were multiple times when I genuinely wanted to just be done with my life.  I felt like my story was over, but I knew giving in to the hurt would only cause the people around me to hurt even more than they already were, so I continued to push through the tough times, trusting that God had a greater plan for me than this being the end.

Since June, I've been seeing a great therapist, and I've been doing all that I can to heal myself.  As hard as it is to admit, I will never be the girl that I was before.  I've been hurt in more ways than imaginable by Cole, and it has been the toughest trial of my life.  I still do not fully understand

how someone could do what has been done to me, but as time goes on, I've gotten a more clear understanding of it.

Every day when I go out in public, I get nervous, filled with anxiety, and scared that someone is going to make a comment and everything--someone will make a comment about everything to me and I will be humiliated all over again.  It's hard to describe what it feels like for everyone to have a certain opinion on your life without even knowing the true story.

Some nights, I lie awake, because every once in awhile, I dream about it.  I just think about everything I could have done to change what has happened.  I've struggled a lot with blaming myself for what has happened.  I'm a smart girl, and I know right from wrong.  Why didn't I know better?  Why didn't I stop him?  And why didn't I tell anybody?  And if I'm being a hundred percent honest, I can't even answer those questions.  The only thing I can do is take care of myself and move on from the traumatic time in my life.

I want to start a family one day and have children, but knowing how easy it is for something like this to happen to a child, it scares me to think if I could even protect them from the disgusting people in this world.  How would I ever trust anyone with my kids?  The biggest fear of having a family, though, is, what if, after Cole is released, he tries to reach out to me or my children?  And that is a constant

fear.

I struggle with my perception of love, now knowing that someone can tell you all these things and truly not mean a single word. I do believe he cared for me, but he cared for me in the worst way possible. I was used for personal pleasure, and it hurts knowing how much my trust was completely taken advantage of.

One thing I have said since day one is, I hate that this has happened to me, but I'm glad that I will be the last girl that Cole Underwood ever does this to. While, at first, I felt hopeful and doubtful in my ability to ever get better, I now know that I am stronger than I could have ever imagined, and I have more people who truly care and want to be there for me than I ever thought possible.

When I look back to the moment in my life when everything felt like it was crashing down, when I was overwhelmed, lost, and unsure of how to keep moving forward, I see now that, during those times, it would have been easy for someone--to look for someone or something to pull me out of the darkness, to make everything better. But now I realize something important, that it was me who saved myself from something that I never thought I would recover from.

Even though I'm terrified I'll be humiliated again for making this victim impact statement, I know it needs to be done. I hope, if there's a girl out there who's going through

what I have been through, she has the chance to hear my story and know that it is okay to speak up.  There are people who want to help.  And just because you have one bad chapter does not mean your story is over.  And that is something that I wish I could have understood eight months ago.

I want the court and judge to know about me and what I have had to go through.  What has happened to me hasn't gone away, and it never will, but it has made me into the brave individual I am standing before you-all today.  Others would say I'm a victim of sexual assault and it affects me every day, everywhere that I go.  And while, yes, that may be true, I would preferably call myself a survivor who continues to prove that no matter what happens, you can always turn your life around for the better.

Please consider me and my life when you sentence this person to prison.  Why should he get to have the chance to ruin someone else's life ever again?

Thank you.

THE COURT:  Thank you, Ms. J.

Ms. Stephens, any objection to marking for record purposes a written copy of that victim impact statement--
We'll mark it as Exhibit B.  Any objection?

MS. STEPHENS:  No, Your Honor.

THE COURT:  Ms. Woolam, you may approach with what will be marked and recorded as Exhibit B for any record in this

case and in any record on appeal.

And, Ms. Woolam, you may call your next victim impact statement.

MS. WOOLAM:  Your Honor, the United States does not have any other victim impact statements to present.

THE COURT:  Did the government otherwise comply with any and all victim reporting requirements in identifying and consulting victims?

MS. WOOLAM:  Yes, Your Honor.

THE COURT:  so those statutory obligations have been met?

MS. WOOLAM:  Yes, Your Honor.

THE COURT:  Okay.

Now, Ms. Stephens, I have received and reviewed numerous character statements on behalf of Defendant.  Let me list the names so that my list matches yours: Martin Birkenfeld, Nancy Seliger, Lesa Thornberry, Brandi Johnson, Pastor Keith Hight, Don Carthel, Allison Hayes, Tina Knight-Gray, Nancy Allen, Jan Hodges, Lynda Underwood, Lori Hunnicutt-Hayes, Lisa Guest, and then Nedra Hunnicutt.

Is that the complete listing of the character statements submitted in written form?

MS. STEPHENS:  Yes, Your Honor.

THE COURT:  And which of these persons will be testifying through their live presence today?

MS. STEPHENS:  Three, Your Honor: Ms. Lynda Underwood, his mother; Ms. Lori Hunnicutt-Hayes, his aunt; and Billy Underwood, his father, would like to be heard.

THE COURT:  Okay.  And we'll follow the same protocol here, because I anticipate this case will be subject to appellate review, and we'll place each of these character statements under oath so that they are sworn.  And if you have copies of any written statements, we'll admit them as exhibits as well.  So it's not necessary that you have the written form, but if you do, I'll also include those as exhibits to this sentencing hearing.

So at this time, you may call your first character statement.

(PAUSE)

THE COURT:  Please approach the podium.  Begin with a statement of your full name to identify your presence in court today.

BILLY UNDERWOOD:  Yes, sir.  Billy Underwood.

THE COURT:  Okay.  You may take as much--  Remain standing.  Raise your right hand.  My courtroom deputy will administer the oath.

(THE OATH IS ADMINISTERED BY THE COURTROOM DEPUTY)

THE COURT:  You're now under oath, and you may take as much time as you need.

BILLY UNDERWOOD:  Yes, sir.  Thank you.  I didn't

write a long letter.  Just got to give me a little minute.

THE COURT:  You can take as much time as you need. And you can avail yourself of water and tissue.  Both are available.

BILLY UNDERWOOD:  I know a lot of people in this courtroom.  Grew up in Perryton, everything.  All I can say to everybody in here, I apologize.  I feel like a failure as a father for not knowing what was going on.  And I only heard about this about three years ago.

But I do know that, you know, Cole, when growing up, was a pleaser.  He pleased people.  All through school, he--even through elementary, through high school, he was a pleaser.  He never was in trouble.  He wasn't--he wasn't a drinker.  He wasn't a partier.  He was more the DD for all the football players in high school.

He goes to college, president of Phi Delts, you know.  Wasn't a party drinker there either.  He was a pleaser. He always wanted to do the right thing.  He was, yeah, like I said, the DD there.

You know, tried to make a career, you know, coaching and all that, too, but, you know, that's been taken away from him.  I don't know the law, but I'm pretty sure, you know, he'll never coach.  He'll never teach.  He'll have to register.  You know, I'm pretty sure his life is pretty much taken away from him, and that breaks my heart.

Me and his mother was good parents.  We gave them everything, and it's truly sad that we're here today.  And I apologize to everybody, because it's a burden on a parent.  And--  I don't know.  I love Cole, and I love C., and I apologize to both of them also.

That's all I've got.

THE COURT:  Thank you, Mr. Underwood.  You may return to the gallery.  The Court will give appropriate weight to your character statement.

And, Ms. Stephens, I believe I heard Mr. Underwood state that he didn't have a written form for submission as exhibit.  Is that correct?

MS. STEPHENS:  That's correct, Your Honor.

THE COURT:  You may call your next character statement.

MS. STEPHENS:  Thank you.

(PAUSE)

THE COURT:  Please approach the podium, and begin with a statement of your full name to record your presence in court today.

LORI HUNNICUTT-HAYES:  Lori Hunnicutt-Hayes.

THE COURT:  Okay.  And please raise your right hand.  My courtroom deputy will administer the oath.

(THE OATH IS ADMINISTERED BY THE COURTROOM DEPUTY)

THE COURT:  And, Ms. Hunnicutt-Hayes, you may

proceed, and you may take as much time as you need.  And if you have a written statement, we'll also mark that as an exhibit.

LORI HUNNICUTT-HAYES:  Okay.

I am Cole Underwood's aunt and godmother.  His mother, Lynda Underwood, is my baby sister.  When Lynda had her firstborn, Cole, it was an ecstatic moment for me.

First of all, I'm going to apologize, because I didn't bring my reading glasses and I'm old, so I'm a little concerned I'm not going to be able to see a lot of it.

Can I see if my reading glasses--

THE COURT:  Yeah, absolutely.  You may return to the gallery.  You may retrieve your glasses or anything else that will help.

(PAUSE)

THE COURT:  And you may start anew if you want to start over--

LORI HUNNICUTT-HAYES:  Okay.  Well, thank you.

THE COURT:  --with the words now visible.

LORI HUNNICUTT-HAYES:  Yes, they are.

I am Cole Underwood's aunt and godmother.  His mother, Lynda Underwood, is my baby sister.  When Lynda had her firstborn, Cole, it was an ecstatic moment for me.  She has always been my favorite sibling.  There are a total of five children.  And I'm not sure who actually was more excited, Cole's parents or me.  That's one of the reasons they asked me

to be his godmother.  What an honor.

I watched Cole grow up in the church, be baptized at the Methodist church in Perryton, thrive as a toddler and on into adulthood, all the while keeping God in his pocket.  He had very ambitious dreams of being a coach and teacher, following in his mother's footsteps as to teaching, and he fulfilled that dream.

I must add here that my degree is in criminal justice and have now been working in this field over 46 years in Amarillo, and my only child is an attorney in Dallas.  I might have been just a little disappointed at his choice of careers, although it was his path, and he followed it.  And it made him happy, so it made me happy.

He was a coach and teacher and was great at both. Right after graduating WT, Cole started his teaching/coaching career at AHS, Amarillo High School, that lasted six years. And in those six years, he was surrounded by thousands of female students, both in classes and in athletics, without any incidence of inappropriate behavior.

He then left AHS in good standing to follow a fellow coach, also from Perryton, that wanted Cole on staff at Perryton High School.  That head coach that Cole followed only stayed one year, and that is when Cole was asked by the board to become head coach and athletic director.

Twenty-eight seemed awfully young to me to become

an AD, but Cole took that challenge one week before the tornado hit.  And I truly believe this added stress onto his duties as a newly hired AD and having an unsupportive wife and subsequent divorce took a heavy toll on Cole.  He had always been able to handle anything thrown his way, and suddenly he was distraught. This was around Christmas 2023.  I am not making excuses for him, but I do truly believe these stressors contributed to him falling in love with the high school student in this case.

To that, the love letters I have read that she wrote Cole expressed her deep love and devotion for him and expressed her gratitude for helping her set goals for a successful future.

In January of 2022, I was diagnosed with cancer, acute lymphoblastic leukemia.  ALL, as it is called. Throughout my three-year cancer battle, Cole was always there, calling and even driving to Baylor Leukemia Hospital to stay with me.  That's my Cole.

If I could say anything about Cole that has always concerned me, it would be that he was a bit naive and literal when it comes to lots of things, and still is.  He has never drank or gone to bars ever, even while in college.  Few people can say that, but he can.  The fact that he has never gotten a speeding ticket or been in any kind of trouble with the law is a little jaw-dropping, especially to me.

In working in criminal defense, both for a DA or

private practice firms, or in my criminal defense investigations company since I've owned in 2010, I've been involved in hundreds of criminal state cases, and Cole is the first defendant I've known that doesn't fit the mold in not one of my cases.

Your Honor, Cole made a grave mistake that he has taken responsibility for, and as a result, he has lost his career, his teaching license, his livelihood, and his dogs. And my prayer is that you take all of his past wonderful achievements into consideration when making your decision on sentencing.

Thank you, Judge Kacsmaryk, for your time and attention in reading this. If you have any questions, please let me know. God bless. Lori Hunnicutt-Hayes.

THE COURT: Thank you, Ms. Hunnicutt-Hayes. I will add your character statement in the form of live testimony to the written statement that you submitted. The Court has already reviewed that written character statement.

Ms. Woolam, any objection to marking the written statement as Exhibit C to this sentencing hearing?

MS. WOOLAM: No, Your Honor.

THE COURT: And, Ms. Stephens, you may approach with what will be marked and admitted as Exhibit C. It is made a part of the record in this case and in any record on appeal.

And, Ms. Hunnicutt-Hayes, you may return to the

gallery.

MS. Stephens, you may call your next character statement.

MS. STEPHENS:  Thank you, Your Honor.  It will be his mother, Lynda.

THE COURT:  You may approach the podium.  And please begin with a statement of your full name to record your presence in court today.

LYNDA UNDERWOOD:  Lynda Hunnicutt Underwood.

THE COURT:  And please raise your right hand.  My courtroom deputy will administer the oath.

(THE OATH IS ADMINISTERED BY THE COURTROOM DEPUTY)

THE COURT:  You may proceed, and take as much time as you need.

LYNDA UNDERWOOD:  Your Honor, I wrote a briefer statement today instead of reading my whole letter.

THE COURT:  Understood.

LYNDA UNDERWOOD:  I'm speaking today in support of my son Cole regarding his case before your court.  My intent is to provide insight into Cole's character, qualities, and positive impact he has had on those around him.

As his parent, I have had the privilege of watching Cole grow into a kind, hardworking, empathetic, and responsible young man.  He taught and coached with Christ in his heart, helping those in need, pushing himself daily to live by

example.  These actions reflect the values he strives to uphold in his daily life.

Cole is also someone who has taken full responsibility for his actions, and he works to learn from those challenges.  I truly believe that this situation is an opportunity for him to continue growing, and I am confident he will take this as a chance to make meaningful changes in his life.  I pray that this one mistake will not overshadow all the good he has accomplished in his short life.

I respectfully ask for your consideration and understanding in evaluating his case.  Please know that he has a strong support system, and he is committed to moving forward in a positive direction.  He will live with me, with a huge network--most of who are here--of supportive family members and many friends.  He will have a job, a car, and will be successful, productive member of society, if you give him a chance to redeem himself.

He has taken full responsibility for this mistake, and I know it will never happen again.

I love both of my children, but his sister C. has been under psychiatric care for most of her adult life and is a liar, a sociopath, and has developed an intense hatred of me since my divorce from her father over alimony that I received, and still receive, because of his infidelity.  And because of that, she is turning on Cole to punish me, not--not

him, and that breaks my heart.  I want you to know that.  I do love them both.

Thank you for giving me the opportunity to speak. My letter submitted to the Court earlier was much more detailed, but today, I just want you to know that Cole is remorseful, and he is loved beyond measure by so many and isn't through being a very successful member of our society.

Thank you, Your Honor.

THE COURT:  Thank you, Ms. Underwood.

And, Ms. Woolam, any objection to marking the written version of that character statement as Exhibit D to this sentencing hearing?

MS. WOOLAM:  No, Your Honor.

THE COURT:  And, Ms. Stephens, you may approach with the letter version of that character statement.  It will be marked and entered as Exhibit D in the record in this case and in any record on appeal.  And Ms. Underwood's live testimony will be considered alongside the written statement that was already submitted.

So with that, Ms. Stephens, have you submitted all character statements through live testimony that you intend to submit?

MS. STEPHENS:  Yes, Your Honor.

THE COURT:  And is it defense counsel's preference that Defendant allocute before this Court announces its

tentative determination 3553(a) factor by 3553(a) factor or after we fully adjudicate this Court's motion on variance?

MS. STEPHENS:  Afterwards, Your Honor.

THE COURT:  Okay.  So, Ms. Stephens, as you're well aware from your many hearings before this Court, and also, AUSA Woolam, it's the Court's practice to provide its tentative determination 3553(a) factor by 3553(a) factor.  I am still persuadable.  I'll just ask that any response to that tentative determination be limited to material outside of the written submissions.  I already have the briefing in this case.  I have the character statements and victim impact statements.  But this is without any barrier to additional arguments, as long as they are not cumulative.  So I'll announce the tentative determination, then invite noncumulative argument.

As announced, the Court has tentatively determined that a nonguidelines upward variance to a term of imprisonment of 360 months is sufficient, but not greater than necessary, pursuant to the sentencing factors set forth at 18 U.S.C. Section 3553(a).

In determining that upward variance is warranted in this case, the Court finds that six factors are determinative:

Number one, Defendant's history of sexual abuse detailed by his sister in her victim impact statement and the victim in this case;

Number two, Defendant's deliberate indifference to

the victim's age;

Number three, Defendant's deliberate grooming of the victim;

Number four, the extensive nature of Defendant's sexual relationship with the victim;

Number five, the need to protect the public from further crimes of this defendant; and

Six, the need to afford just punishment for the offense.

Now, while the six factors overlap other 3553(a) concerns, I wanted to identify for counsel and the Court of Appeals the six factors this Court considered in arriving at an upward variance.

In so doing, this Court adheres to an unbroken line of Fifth Circuit cases holding that the district court may consider victim impact statements when weighting the Section 3553(a) factors that apply to sentencing.  As an example, *United States vs. Jones*, 75 F.4th 502, a Fifth Circuit case from 2023 upholding an upward variance that was based in part on victim impact statements.

*United States vs. Jonas*, 824 F.App'x 224, a Fifth Circuit case from 2020 that went further in upholding a district court's upward variance based solely on a victim impact statement.

Furthermore, as the Supreme Court has explained, "A

sentencing judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider or the source from which it may come."  This is a direct quote to *Nichols vs. United States*, 511 U.S. 738.

And by statute--specifically, 18 U.S.C. Section 3661--there is, quote, "no limitation on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

Additionally, as another layer of authority, the Federal Rules of Criminal Procedure provide that the presentence report must contain, quote, "information that assesses any financial, social, psychological, and medical impact on any victim."  This is codified at Federal Rule of Criminal Procedure 32(d)(2)(B).

And as a general matter, a district court may consider victim impact statements, whether sworn or not, at sentencing, as stated in *United States vs. Santana*, 908 F.2d 506, although this Court took the additional precaution of swearing every victim impact statement and every character statement.

Laying that predicate, the Court will now turn to its 3553(a) factor-by-factor analysis.

First, pursuant to Section 3553(a)(1), which

requires the Court to consider the history and characteristics of the defendant.  Here, Defendant has no prior criminal history.  In fact, Defendant's character statements speak repeatedly of his excellent community reputation.  Defendant's character statements also repeatedly highlight Defendant's work ethic, dedication to his community, and his heart to help others.  And, even today, through a live character statement, his father identified the defendant as a pleaser.

From these statements alone, Defendant seems to be a model citizen and a beloved friend and family member.  But the PSR and victim impact statements hint at a much darker side.

In PSR paragraph 52, Defendant admitted that his sister is not supportive of him as their parents because she is disappointed in him.  So this is PSR paragraph 52.

But as Ms. Underwood's victim impact testimony today demonstrates, Defendant's history of sexual abuse began long before the commencement of the instant federal offense of conviction.  Though the Court makes no finding as to whether Defendant actually committed a crime, the Court does find that C.U.'s sworn victim impact statement bears sufficient indicia of reliability and that this Court can justifiably rely on that statement in considering Defendant's history and characteristics under Section 3553(a)(1).

In reaching this conclusion, the Court is guided by

*United States vs. Rodriguez-Mantos*, 748 F.App'x 591, a Fifth Circuit case from 2018.  There, the Fifth Circuit upheld a district court's consideration of a defendant's alleged prior sexual assault in considering criminal history and characteristics, consistent with Section 3553(a)(1).

And though Ms. Underwood's statement is admitted as Exhibit A, I'll recite and summarize factors weighing heavy on this Court's 3553(a)(1) analysis.

The Court finds that the defendant abused Ms. Underwood from fifth grade to her freshman year of high school.  The Court finds that he ripped her innocence from her.

The Court finds that Defendant admitted that much of the abuse was rooted in a youth porn addiction that followed him in adulthood.  The Court finds that the defendant manipulated the victim for the entirety of her known memory.

The Court finds that, as a consequence of this abuse, Defendant [sic] has suffered irreparable harm and is unable to enter a normal relationship with boys and others because of this immense abuse and diagnosed PTSD.

The Court finds that Ms. Underwood's victim impact statement bears sufficient indicia of reliability to find that he has inflicted something like a life sentence on his sister. And the Court finds that the remainder of her victim impact statement should be given considerable weight under 3553(a)(1).

Now, after considering Ms. Underwood's statement,

the Court finds that Defendant's history of sexually abusing his younger sister is an aggravating factor that outweighs the other testimony and character statements of Defendant's good character.  Thus, on balance, the Court finds that the 3553(a) factor aggravates in the extreme and warrants upward variance.

Pursuant to the next factor, Section 3553(a)(2)(A), which requires the Court to consider the nature and circumstances of the offense, to reflect the seriousness of and to provide just punishment for the offense.  As reflected in the unobjected-to PSR paragraph 30 applying Guidelines Section 2G1.3(b)(1), this public-school-employee defendant enticed, groomed, and sexually assaulted a 15-year-old student entrusted to his custody, care, or supervision, all the while invoking the language of love to manipulate his victim and well-meaning family, friends, and neighbors, many of whom mistakenly and shockingly believe that sex with minors is a minor offense.

Defendant first messaged the victim via Snapchat in 2023, at least one month before he separated from his wife. This chronology can be discerned from PSR paragraphs 23 and 55, which were unobjected to.

By at least December of 2023, Defendant's message to Victim became more personal, sexual, and flirtatious.  At all times, Defendant knew the victim was a minor because she was enrolled at Perryton High School, where he coached football

and served as an athletic director.  This is detailed in PSR paragraph 15, 16, and 18.  This is no case of mistaken identity.  Defendant's messages repeatedly told the victim that he, quote, "loved her," and he even referred to the victim as "wifey"--that's w-i-f-e-y--as detailed in PSR paragraph 21.

The Court finds that the defendant deliberately worked to gain the victim's confidence through messages, phone calls, and school encounters.  In fact, subsequent review of the victim's phone showed numerous late-night calls between the victim and Defendant, including one call that lasted over six hours.  This is archetypal grooming behavior.

By her own statements, the victim was struggling in her personal and home life, as reflected in the victim impact statement in PSR paragraph 24 and the one received through live testimony today.  Nonetheless, Defendant purposefully contacted the victim and sought to be her confidant.  The victim explained that, looking back, she could now see that these actions were not love, but deliberate grooming.

Undeterred, Defendant gradually increases intimacy with the victim, ultimately culminating in sexual intercourse with the victim on numerous occasions in his very office at Perryton High School, as detailed in PSR paragraph 19.  By Defendant's admission, he and the victim had sexual intercourse on at least ten occasions, but the victim reported having sexual intercourse at least thirteen or fourteen times, as

detailed in PSR paragraph 18 and 19, which were unobjected to.

The victim also reported that Defendant touched her inappropriately on her breast, buttocks, and vagina on multiple occasions and solicited and received nude photos of the victim on many occasions, as detailed in PSR paragraphs 17 and 19.

Even worse, to better facilitate these illegal sexual encounters, Defendant concocted an elaborate method by which the victim would enter the school via the gym locker room and subsequently go upstairs to Defendant's office.  To cover his tracks, Defendant dimmed hallway lights to conceal the victim from overhead school security cameras.  This is detailed in PSR paragraph 20 in the original criminal complaint.

This victim reported she told Defendant "no" countless times, as stated in her victim impact statement in PSR paragraph 24 and here today at the sentencing hearing.  But Defendant continued to manipulate the victim and continued to ask for sexual favors.  The victim reported crying on the first occasion she and Defendant had sexual intercourse, and yet, the defendant was still undeterred.  He manipulated her into believing that he cared for her.  This is all detailed in the victim's impact statement and reflected in the hurt, fear, and pain observed by this Court at the sentencing hearing.

Accordingly, this Court finds that Defendant knew at all times that the victim was a minor child and, despite this knowledge, deliberately groomed the victim, betrayed her

trust, and sexually abused her.

Furthermore, the Court discerns that many of the character statements filed on Defendant's behalf attempt to minimize Defendant's admitted behavior in a manner inconsistent with all of the Section 3553 factors that apply at federal sentencing.  Several character statements argued for mitigation because Defendant, quote, "was in love"; that Defendant believed she was, quote, "the light that God placed in his life," while he was still married of course; and even identified the victim as, quote, "a willing participant."

Shockingly, other character statements complained that municipal and state law enforcement would never prosecute or punish a sexual predator as harshly as this federal court. This is an indictment of the former somehow masquerading as a criticism of the latter.

But these character statements miss the mark for at least three reasons:

First, the victim and Defendant are not star-crossed lovers trapped in some Shakespearean tragedy. Instead, Defendant is a skilled sexual predator who identified, groomed, and assaulted a 15-year-old minor and, at all times, knew she was beyond the age of consent because he was employed by the very Perryton ISD where Victim was enrolled.  He couldn't have not known.  This is not Romeo and Juliet.  This is predator and prey, hunter and hunted.

Even Defendant understands the difference, even if his friends, family, and neighbors do not.  Unobjected-to PSR paragraph 18 states Defendant, quote, "knew his relationship with Doe was wrong and inappropriate."

Second, the alleged leniency and laxity of municipal and state courts is immaterial to this Court's weighing of the Section 3553(a) factors in federal court.  While Section 3553(a)(6) does instruct this Court to avoid unwarranted sentencing disparities among defendants who have been found guilty of similar conduct, the Fifth Circuit has consistently held that the analysis is focused on similarly situated defendants nationwide in federal courts.  And this Court has conducted and considered the 3553(a)(6) analysis and factors and found that this defendant is not similarly situated to defendants nationwide.

Third, the repeated reference to "love" is tragically misplaced.  Classically formulated, to love is to will the good of the other, not to sexually satiate the self through the enticement, grooming, and assault of a minor, who cannot lawfully consent and did say "no" countless times. Defendant's illegal, exploitive, and objectifying abuse is something like the exact opposite of love.

Accordingly, because of the victim's youth, the defendant's custody, care, or supervisory control, and the extensive nature of Defendant's illegal sexual relationship

with the victim, the Court finds this factor and related facts are aggravating in the extreme under Section 3553(a)(2)(A).

Next, pursuant to Section 3553(a)(2)(C), which requires this Court to promote respect for the law, to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant.  Here, the victim impact statements presented today show that the defendant has a deeply troubling history of sexually abusing young girls.  And the extensive nature of Defendant's illegal sexual relationship with the victim in this case demonstrates the need to deter further criminal conduct and to protect the public from further crimes of the defendant.

The Court finds that 3553(a)(2)(C) is aggravating in the extreme, with particular attention to the "protect the public" language in that factor, though much of the public seems ignorant to the risk.

For these reasons, the Court has tentatively determined, and is still persuadable, but tentatively determined that a nonguidelines upward variance to 360 months' imprisonment is necessary.

And now I'll afford both the government and Defendant an adequate opportunity to respond with noncumulative information or argument.  I'll just caution counsel to recall that variance is governed by Section 3553(a) factors; and departure, by the guidelines.  If you're asking for either,

please identify for the Court the relevant 3553(a) factors for variance and any guideline section that applies to arguments for departure.

Ms. Woolam, you may proceed.

MS. WOOLAM:  Yes, Your Honor.  Thank you, Your Honor.

Your Honor, much of what I would normally say and what I had intended to say has been said by this Court and by C.U. and N.J. in much better terms than I could ever express it.  I applaud both N. and C. for their bravery and strength getting up here today.

I would just reiterate the grooming, manipulation, and sexual abuse that Mr. Underwood has caused these two victims will likely cause lifelong suffering on their end. This was predatory behavior by a 29-year-old man who was entrusted to protect children.  Mr. Underwood was an educator and a head athletic director in Perryton, a small town, which makes it just that much worse.

As a result of his position and even as some of the things highlighted in the defense sentencing letters, he was looked upon as a hero and a pillar of the community, and he used that to prey on a vulnerable 15-year-old child.  He sexually abused her, not just in the sense of her being a minor and fifteen.  You have heard N. testify about her saying "no" to him and her crying at his request of sexual

intercourse.

Despite that, he used his position, he used the secrecy, and he manipulated her into having sex with him over a dozen times in his office, through a well-devised plan using secret and encrypted applications, secret cell phones.  He even enlisted the assistance of another high-school child to deliver a secret cell phone to this young girl after he was arrested and bonded out of jail, because he wanted to continue his predatory sexual behavior.

Mr. Underwood is a man who will do whatever he wants and needs to fulfill his own sexual desires, and he will take extreme steps to hide those actions.

And it should be sickening to everyone here that predators like Mr. Underwood are able to present themselves as these two different personas: the persona that should seem so apparent to everybody in this courtroom after hearing from C. and N. and knowing the facts of this case; and then the public persona, the one he wants the world to believe, the one that is representative in the letters submitted by the defense attorney.

I think that public persona is what makes predators like Mr. Underwood the most terrifying.  Everyone fears the man hiding in a bush that could jump out with a knife.  People don't fear the pillar of the community; the golden child, as C. described, that so many people would think of him as.

Truthfully, the letter from former forensic interviewer Brandi Johnson submitted to this Court by the defendant should make everyone sick and is exactly the reason that Mr. Underwood will continue to be a threat to society. Ms. Johnson describes that she's a trained forensic interviewer, working for years with children who have been sexually abused.

And, despite that, she says that Mr. Underwood is not that person.  She says he's different.  In her letter, she says, "When I would interview children who had been abused, it was children who were not participants.  They were children who did not have a choice and were at the hands of the offender.  Cole was the adult in the situation.  However, the young woman was a willing participant."  She says that the stress caught him up and caused him to do this.

And, Your Honor, I highlight this letter because of her training and experience, because if Mr. Underwood could fool somebody with training and experience in interviewing child victims of sexual abuse to believe that he is not that type of predator, he will continue forever to be a danger to society and to children.  There is so much evidence that he is this danger, and yet, so many people seem unwilling to accept that.

Mr. Underwood has already ruined his sister's life from his sexual abuse of her, and now N. will grow up

likely experiencing some of the same things that C.U. discussed here in court today.  While N. tries to navigate her own high-school years, her own experiences dating, her own trust of boys and others, she will likely always have Mr. Underwood's sexual abuse of her, manipulation, grooming, and that mistrust in the back of her mind.

One can only wonder how this young child will feel the first time she's asked out on a date by a boy, or if a boy tries to hold her hand or kiss her, if a boy asks her to go to prom.  Will she immediately think that that boy, an age-appropriate boy, must only want the same things as this 29-year-old defendant: sexual intercourse and to satisfy his own sexual desires.

On N.'s wedding night, should she have one, will her mind fall victim to the sexual predatory encounters she had with a 29-year-old man that was supposed to be educating and protecting her, that was supposed to be making her a better person and not a worse one.

The nature and circumstances of this offense are deplorable.  This conviction is based on the sexual abuse of N., but, as the Court has highlighted, the Court has heard extensive information about his sexual abuse of C., his own sister.  Mr. Underwood is a deviant sexual predator, and his abuse of these two girls will likely have lifelong impacts on their lives.

For these reasons and all of the 3553(a) factors, specifically to punish Mr. Underwood for the heinous nature of his conduct, the need for a sentence to deter him and to afford a just punishment, and, most importantly, to protect society and protect children from his behavior, the United States requests a harsh sentence, one that he so justly deserves, but at no less than the top of the advisory guideline range.

Thank you, Your Honor.

THE COURT:  Thank you, Ms. Woolam.

Ms. Stephens, you may now respond--

MS. STEPHENS:  Thank you, Your Honor.

THE COURT:  --with any argument that is not cumulative, and you may take as much time as you need.

MS. STEPHENS:  Thank you, Your Honor.

First, we respectfully object to any upward variance in this case.

Thankfully, none of us are the total sum of our very worst action.  It's been my honor to get to know Cole Underwood.  And this Court has seen me practice a lot, knows me well, knows that while I like most of my clients, Cole is special.  Has he done a bad thing?  Yes.  But is he a good man?  Also, yes.

The Court may wonder how I can say that he's a good man given this offense and the stigma related to this offense.  Well, as you've already heard, Cole was excellent through

school, has often volunteered to be a designated driver to keep people safe, became a respected teacher in Amarillo, then an athletic director in Perryton, and helped lead the recovery efforts in the tornado.  And he's not yet thirty years old. Until now, he has never been in trouble with the law, not even a speeding ticket.  Generally, I can't say those things about my clients.

You can see from his character letters how well-thought he is.  And I did hear what you said about them, and I did know that it was a double-edged sword presenting them to the Court.  But I thought it was important for you to get to know a little bit more about who he is in the community.  I don't believe I've ever before been able to submit a character letter from a chief of police or a senator's wife or a representative's wife, or even a forensic interviewer, much less many parents, teachers, and business owners.

Brandi Johnson's letter shows that Cole helped her daughter when she was his student and very fragile and was never inappropriate with the child.  That demonstrates that he is not someone who habitually is searching for the most vulnerable to cull out of the crowd.

I'm sorry, Your Honor.  Just a moment.

THE COURT:  You can take as much time as you need. We also have water, if that will help.

MS. STEPHENS:  Thank you.

Brandi talked about how someone can be a willful participant even when they can't legally consent. And, of course, I've been in the criminal justice system long enough that I don't abide by that same argument. But I do understand how the public can make that argument, especially since Brandi was also a teenage girl at some point.

Most teenage girls, during some point in our lives, have had a crush on an older guy or have watched "Little House on the Prairie" where Laura Ingalls Wilder falls in love with her husband when she's sixteen and he's twenty-six. Unfortunately, I can speak from experience as a woman; when we're teenagers, we often have those crushes on older men.

And while it's always wrong for a guy in his twenties or older to act on that, sometimes when a man is in a vulnerable position with a failing marriage and unaddressed depression and anxiety and an unaddressed porn addiction, they can make the wrong actions. But that is not the sum of who they are.

And that is not an excuse. Cole knows that there's no excuse for what he did, and he has accepted full and complete responsibility. And you will hear from him next and how disgusted he is with himself. And I understand what the Court said. I thought the definition you gave of love is absolutely beautiful, and it's one that I learned as a teenager in youth group when we would talk about Someday a Marriage

Without Regrets.

THE COURT:  It's Thomas Aquinas.

MS. STEPHENS:  Yes.  I love that.  And I still remember the Someday a Marriage Without Regrets.  I still have the workbook from when I was twelve.

And regardless of our judgment of it, my client truly, even today, believes that he was in love.  It was wrong.  He acted on it.  It was wrong.  And he now stands before you metaphorically--he's sitting right now--ready to pay the price.

But he is not the typical pedophile that I have dealt with in my 20 years.  I don't believe that he is generally attracted to teenagers.  While I understand that all relevant conduct is always included in the PSR, it's been incredibly difficult for him and his family to understand that relevant conduct and unproven allegations alone can count against Cole in the victim statements in the PSR.

While my client understands the legal severity of the crime and Cole understands the legality of the Chapter 4 five-point enhancement that was added into the offense conduct, his family and his support group behind me has struggled with that a lot.

One thing that the family asked me to make sure that the Court is aware of is that they feel this is not a typical violent offense by a typical pedophile and that he is not dangerous.  And I would agree that he is not the typical

pedophile that I have dealt with.  And they struggle with understanding that the additional five points are there because he confessed, even before N. did, that this had happened more than once with N.

You can see from the character letters that in December 1963, Cole's grandfather was twenty-seven when he married his 15-year-old girlfriend, who became the grandmother. She was pregnant at the time.

In Randall County jail, Preacher Richard James ministers there, and he told Cole that he is sixty-eight years old and was twenty-six when he married his wife, who was sixteen on the day they wed.

Cole knows these examples do not make it right. But he and his family have struggled with accepting the label of "pedophile," because he truly--he believes he still loves her.  Like his grandfather and the preacher before him, he believes he fell in love with one teenager who was too young and who he should have left alone.

In Randall County Jail, the pedophiles are ignored and not spoken to by other inmates because, of course, as everywhere, they are considered the worst of the worst.  My client, on the other hand, though he has been all over the TV news in jail and everyone knows why he's in there, is well thought of and has many friends, and is even helping other inmates to learn English.

It has really been hard for him and his family to understand why this case went federal, and you heard that in the character letters. And though I have often explained the legalities of federal versus state, the people behind me are still struggling to understand that if he had been an average Joe, this probably wouldn't have gone federal.

You can see from the letters that it's been hard for the family and friends and educators and wives of politicians and forensic interviewer to understand and accept that the guideline range in the federal system for Cole are huge compared to what they see in the news for people in the state system. It's been hard for them to accept that if he had been average, he might be in the state system.

No one in the character letters or in his family, or even Cole, is asking for you to forgo punishment. They are simply asking that you temper that punishment with mercy. Cole has demonstrated repentance, and I join the family in pleas for mercy in this case. The huge support system behind me did not know of his struggles, didn't know of his porn addiction, his depression, his anxiety. But they do now. And now Cole understands why it's so important to be open and vulnerable with those who love him about his struggles and his weaknesses.

Other than this offense, which is very, very serious, Cole has never had a speeding ticket. He is not a career criminal or someone who generally disregards the law in

day-to-lay life.  He is not the habituals that we see so often in court.

The guideline range in this case is 235 months to 293 months.  I join with his family and friends in asking the Court to please apply mercy and stay within the guideline sentencing range in this case.  Thank you.

THE COURT:  Thank you, Counselor.  And in objecting to the Court's tentative determination that upward variance is necessary, is defense counsel objecting on procedural unreasonableness or substantive unreasonableness grounds?

MS. STEPHENS:  Both, Your Honor.

THE COURT:  Okay.  So the Fifth Circuit reviews criminal sentences for reasonableness at all times.  This is held in *United States vs. Bostic* and explained in cases applying same.

First, the appellate court determines whether the district court's sentence was procedurally unreasonable.  Now, a sentence may be procedurally unreasonable due to a procedural error, quote, such as failing to calculate or properly calculate the guidelines range, treating the guidelines as mandatory, failing to consider Section 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence, including an explanation for any deviation from the guidelines range.  This is a summary of *United States vs. Soto*, 332 F.App'x 984, citing

the Supreme Court's opinion in *Gall*, G-a-l-l.

What is the basis for the procedural unreasonableness objection?

MS. STEPHENS:  Your Honor, I made a mistake.  I waive the procedural and stick with the substantive.

THE COURT:  Okay.  I just--

MS. STEPHENS:  I'm sorry, Your Honor.

THE COURT:  Because I anticipate there will be lengthy appellate work following our work in the district court, I just want to make sure I give you an opportunity to preserve your objections.

So on substantive reasonableness, that applies when a court ignores a factor that should have been given considerable weight, gives considerable weight to an improper factor, or is the result of a clear error in judgment in balancing the sentencing factors.  That is a direct quote from *United States vs. Chandler*, 732 F.3d 434, a Fifth Circuit case from 2013.

As you know, defendant's mere disagreement with the sentence selected by the district court never warrants reversal.  But is there any factor that you would address as substantively unreasonable?

MS. STEPHENS:  Your Honor, the need for just punishment for someone who has never even had a speeding ticket, I would argue that the guideline range would be

sufficient for that, as well as deterrence.

And then also, respectfully, Your Honor, I believe the facts of this case--I feel that the facts of this case are outside the heart of what the Sentencing Commission considered when it drafted the guidelines for a typical pedophilia case.

And so it would be those two things. I just feel like 360 months is draconian comparatively to what went on and his prior history.

THE COURT: Understood. I have your objection. I'll carry forward that objection before finally adjudicating this Court's motion for upward variance.

At this time, I'll turn to Defendant and explain his right of allocution.

Now, Mr. Underwood, you have an absolute right to allocute at federal sentencing. Allocution simply means that you may tell the Court any information you think is relevant to the sentencing decision.

You may read aloud a prepared written statement that can also be marked and admitted as an exhibit. You can present arguments for the Court to consider or facts for the Court to consider. There's no bar to what you can tell this Court through your allocution.

Now, you do have that absolute right to allocute, but you can never be forced, compelled, or coerced into allocution.

Do you wish to exercise your right to allocute?

THE DEFENDANT:  Yes, sir.

THE COURT:  You may take as much time as you need, and you may do so seated or standing, whatever is most comfortable and gives you greatest proximity to the microphone.

THE DEFENDANT:  Your Honor, my whole life, I dedicated the majority of my time to doing everything I can to help people and to keep people happy with me.  I have never and would never do anything to intentionally bring hurt or harm to anyone, and knowing I've done just that for N., N.'s family, my family, countless others who depended on me has been debilitating for me.

I'm here before you today because I committed a wrong.  I fell in love, and I know it was wrong.  I don't want to shy away from that.  Most people who know me would tell you that I'm the furthest thing from malicious, and I truly hope those listening today know how deeply sorry I am from the bottom of my heart.  Knowing the pain I've caused has nearly killed me.  But I'll spend the rest of my life working to remedy those decisions and working to be a better man for my family and for everybody that has supported me through this time.

Thank you.

THE COURT:  Thank you, Mr. Underwood.  Is there anything else you would say in the form of allocution?

THE DEFENDANT: No, sir.

THE COURT: Okay. The Court will give appropriate weight to your allocution.

Okay. Any final argument from-- Well, let me rule on this Court's motion for upward variance.

This Court overrules Defendant's objection to upward variance and hereby adopts as its final finding that a nonguidelines upward variance to 360 months' imprisonment, followed by a lifetime term of supervised release, is appropriate pursuant to the 3553(a) factors previously identified.

In response to Defendant's substantive unreasonableness argument, this Court did an extensive 3553(a) factor-by-factor analysis. Defendant's mere disagreement with this Court's weighting of the factors relevant to just punishment under Section 3553(a)(2)(A) do not constitute sufficient rebuttal evidence or information. The Court detailed its reasons in its announcement of its tentative determination, and the Court stands by those reasons.

Because this Court made extensive findings relevant to victim impact and the two statements presented to this Court, the Court disagrees with Defendant's weighting of the Section 3553(a)(2)(C) factor; specifically, deterrence and the need to protect the public from further crimes.

Here, the defendant merely disagrees with the

Court's weighting of that.  The Fifth Circuit and the Supreme Court have repeatedly held that defendant's mere disagreement with the weighting of an individual or all 3553(a) factors does not constitute reversible error.  Counsel may refer to *United States vs. Ruiz*, 621 F.3d 390, a Fifth Circuit case from 2010, or *Gall*, the famous Supreme Court case, 552 U.S. at 51.

Regarding the scope of the guidelines and what they were intended to punish, this Court is construing that as invoking the Section 3553(a)(6) factor, which instructs this Court to avoid unwarranted sentencing disparity.  But the key word in that analysis is "unwarranted."

The adjudication of an upward variance is a fact-intensive inquiry, as this sentencing hearing has much demonstrated.  And as the Fifth Circuit has held, case-specific facts can justify sentencing disparities between similarly situated defendants.  And courts should at all times consider the totality of the circumstances in determining a defendant's sentence.

With an eye towards 3553(a)(6), the Court conducted an independent analysis of the relevant JSIN statistics to ensure that this Court was mindful of the need to avoid unwarranted sentencing disparity.

So for the fiscal years 2019 to 2023, there were 41 defendants whose primary guideline was Section 2G1.3, with a final offense level of 38 and a Criminal History Category of I,

after excluding any defendants who received a Section 5K1.1 departure for substantial assistance.  For the 41 defendants who received a sentence of imprisonment in whole or in part, the average length of imprisonment was 202 months, and the median length of imprisonment was 185 months.

The sentencing data provided does not reflect the Commission's recommendation regarding the appropriate sentence to be imposed or represent the Commission's official position. Nor does the information provided reflect the Commission's position regarding the weight to be given.

If the Court does consider the above sentencing information as part of its consideration under 3553(a) generally, and 3553(a)(6) specifically, it should do so only after considering the properly calculated guidelines range.

The Court did all of the above.  This Court does find, for the reasons specifically identified, that Defendant is not similarly situated to the defendants appearing in this Court's independent review of JSIN data.

For all of the reasons stated, with particular attention to the need to protect the public, and particular attention to the victim impact analysis, this Court finds that there is no sentencing disparity based on that analysis, that data, and this Court's weighting of the 3553(a) factors.

So this Court did independent JSIN research to ascertain the median mean sentence and did determine that the

factors weigh in the other direction and do support upward variance in this case.

Now, does counsel know of any reason why this Court may not impose lawful sentence?

MS. STEPHENS:  No, Your Honor.

THE COURT:  Any from the government?

MS. WOOLAM:  No, Your Honor.

THE COURT:  Having thoroughly considered the permissible factors set forth at 18 U.S.C. Section 3553(a), the advisory sentencing guidelines, the conduct admitted in the factual resumé, and the capable, effective and, indeed, impeccable assistance of defense counsel which significantly reduced Defendant's sentencing exposure in this case--  This Court considered rejecting the plea agreement in this case because of the nature and harm reflected in the sentencing file, but I was persuaded by the capable and effective and, indeed, impeccable assistance of Ms. Stephens that this Court should enter an order adopting the report and recommendation of the magistrate judge, and this Court did not reject the plea agreement and, at all times, has been bound by that plea agreement.

The Court also considered all mitigating and aggravating factors.

It is the judgment of the Court that the defendant, Cole Patrick Underwood, is hereby committed to the custody of

the Federal Bureau of Prisons for a period of 360 months.

The Court does order the defendant to pay the Justice for Victims of Trafficking Assessment Act in the amount of $5,000.

But the Court does not order a fine or costs of incarceration, because the defendant does not have the financial resources or future earning capacity to pay one in addition to the JVTA assessment.

The Court does, however, order a one-time mandatory special assessment of $100, which is due and payable immediately.

Now, regarding forfeiture, pursuant to 18 U.S.C. Section 924(d) and 28 U.S.C. Section 2461(c), and subject to the provisions of 21 U.S.C. Section 853(n), it is ordered that Defendant's interest in the following property is condemned and forfeited to the United States:

An Apple Watch Ultra 2, SN LFMKQ9GWTF--I'm sorry--W2F; IMEI 35816118455839;

An Apple iPhone 15 Pro Max, SN K93MYVX2NH; IMEI 356371485976711;

A black/gray Amazon tablet, Model Number T76N2P;

An Apple MacBook Space Gray laptop, SN C02V70LNHTDD; and

A red Apple Watch Series 7 with a gray band.

The Court does not order restitution because, while

the Title 18 offenses of conviction mandates restitution, no restitution claims have been made as of this date.

It is further ordered that, upon release from imprisonment, Defendant shall be placed on supervised release for a term of life.  While on supervised release, Defendant shall comply with the mandatory conditions listed at Section 3583(d) and Section 5D1.3(a); the standard conditions listed at Section 5D1.3(c); and the following discretionary, special, and additional conditions of supervised release listed in Sections 5D1.3(b), (d), and (e) of the guidelines manual. And these are detailed in the written notice of intent to impose conditions of supervised release on pages 4 and 5.

Number one, without permission from the Court or probation officer, the defendant shall have no unsupervised communication or contact with persons under the age of eighteen.  The defendant shall not be at or near places where minors congregate, nor shall the defendant create an opportunity for minors to congregate.  The defendant shall not be employed or be a volunteer at places where minors congregate, and the defendant shall not date or befriend someone who has minors.

Number two, the defendant shall have no contact with the victim(s) or the victim's family, directly or indirectly, without prior approval by the probation officer.

Number three, the defendant shall not possess, have

access to, or utilize a computer or internet connection device, including, but not limited to, Xbox, PlayStation, Nintendo, or similar device, without permission of the probation officer. This condition requires preapproval for categories of computer or internet access or use. It does not require separate preuse approval every time the defendant accesses or uses a computer or the internet.

Number four, the defendant shall participate in sex offender treatment services as directed by the probation officer until successfully discharged. These services may include psychophysiological testing, that is, clinical polygraph, plethysmograph, and the ABEL screen, to monitor the defendant's compliance, treatment progress, and risk to the community. The defendant shall contribute to the costs of services rendered, copayment, at a rate of at least $40 per month.

Number five, the defendant shall participate in outpatient mental health treatment services as directed by the probation officer until successfully discharged. These services may include medications prescribed by a licensed physician. The defendant shall contribute to the costs of services rendered, copayment, at a rate of at least $40 per month.

Ms. Stephens, did you and your client receive an advanced written copy of the notice of intent to impose

conditions of supervised release?

MS. STEPHENS:  Yes, Your Honor.

THE COURT:  Did you receive a full and adequate opportunity to review the written notice with your client?

MS. STEPHENS:  Yes, Your Honor.

THE COURT:  Did you explain the conditions of supervised release stated therein and pronounced aloud at sentencing?

MS. STEPHENS:  Yes, Your Honor.

THE COURT:  Does your client have any objections to the conditions of supervised release stated in the notice, pronounced aloud, with special attention to the discretionary, special, and additional conditions appearing on page 4 and 5?

MS. STEPHENS:  No, Your Honor.

THE COURT:  And, Ms. Woolam, did the government receive a timely copy of that notice?

MS. WOOLAM:  Yes, Your Honor.

THE COURT:  Any objections?

MS. WOOLAM:  No, Your Honor.

THE COURT:  This Court did receive and did review a fully executed copy of the written notice of intent to impose conditions of supervised release.  It is dated February 11, 2025.  It bears the signature of the defendant, defense counsel, and this Court.  It is made a part of the record in this case and in any record on appeal.

The notice and conditions of supervised release are hereby adopted, ordered, and imposed as just pronounced by the Court.

Now, the Court will enter its statement of reasons.

Here, the Court incorporates by reference its analysis of the Section 3553 factors in adjudicating its own motion for upward variance, and also incorporates by reference its response to Defendant's objections to upward variance.  And the Court finds that Defendant has adequately preserved his arguments to upward variance for further appellate review.

The Court did impose a lifetime term of supervised release for added deterrence and protection.

In light of the Fifth Circuit's recent opinion in *Diggles*, the Court adopted, imposed, and ordered the discretionary conditions of supervised release because they are consistent with 18 U.S.C. Section 3583(d)(1), (d)(2), and (d)(3).

And this Court expressly states that the discretionary conditions involve no greater deprivation of liberty than is reasonably necessary, consistent with 3553(a)(2)(B), (a)(2)(C), and (a)(2)(D).

The Court has now stated the sentence and its reasons therefore.  Ms. Stephens, any objection to the statement of sentence?

MS. STEPHENS:  No, Your Honor.

THE COURT:  Any objection, Ms. Woolam?

MS. WOOLAM:  No, Your Honor.

THE COURT:  The Court hereby orders the sentence imposed as stated.

Finally and emphatically, even if the correct advisory guidelines range was not considered in this case, this Court would have imposed the exact same sentence had it not made the error, and it would have done so for the exact same reasons given during this sentencing hearing, regardless and irrespective of the applicable advisory guidelines range.

To be pellucidly clear, even had Defendant prevailed on objections to the enticement sentencing enhancements listed in the revised PSR paragraphs 30, 31, 32, and 33, this Court would have used the tool of upward variance to arrive at the exact same sentence using the exact same Section 3553(a) analysis and weighting: 360 months' imprisonment and lifetime supervised release.

Now, Ms. Stephens, as you well know, this is the portion of the sentencing hearing where I will hear your recommendations for continued medical, vocational, and residential care.

On the medical front, PSR paragraphs 57, 58, and 59 report the defendant is in good health, in no need of medical treatment, but that he is interested in mental health treatment.  Are there any programs you would request?

MS. STEPHENS:  No, Your Honor.  He just wants to address his depression and anxiety.

THE COURT:  Okay.  Any particular recommendation that he be subject to a medical--or, I'm sorry, a mental health evaluation to identify potential treatment for those disorders?

MS. STEPHENS:  Yes, we'd like that, Your Honor.

THE COURT:  And any objection to psychiatric medications, if licensed and monitored by an MD, physician or psychiatrist?

MS. STEPHENS:  No objection at all.

THE COURT:  Any objection to the requested recommendation?

MS. WOOLAM:  None from the government, Your Honor. Thank you.

THE COURT:  This Court does recommend that the defendant be allowed to participate in a full mental health evaluation to identify possible treatments for self-reported anxiety and depression, to include talk therapy, counseling, and any pharmacological interventions, but only if monitored by a licensed physician or psychiatrist.

On vocational training, in PSR paragraph 60, Defendant did not make any vocational training or continued education request, but he's obviously educated.  He's learned. He has degrees and diplomas and limitless potential to pursue different academic pursuits.  What would you request in the

form of training?

MS. STEPHENS:  Your Honor, he hasn't really made a decision regarding that.  He is more interested in trying to get placed at Seagoville so he can also get the sex offender treatment and remain as close to family as possible.

THE COURT:  So just a--what of a generic recommendation for continued education consistent with his security classification and eligibility?

MS. STEPHENS:  Yes, Your Honor.

THE COURT:  Any objection?

MS. WOOLAM:  None from the government, Your Honor.  Thank you.

THE COURT:  Okay.  And let's jump forward to a recommendation for FCI Seagoville.  Because of the particularized programs relevant to this offense category, is that your sole requested recommendation on facility?

MS. STEPHENS:  Yes, Your Honor, or anywhere like that as close to family as possible.

THE COURT:  Okay.  Any objection, Ms. Woolam?

MS. WOOLAM:  No, Your Honor.

THE COURT:  So let's combine the vocational and the residential recommendation.  This Court does emphatically recommend FCI Seagoville in the Northern District of Texas to allow Defendant to avail himself of treatment options and education facilities, and also to protect Defendant from any

abuse he might suffer for the category of this offense.  And all of this education and residential recommendation is made subject to his security classification and eligibility, as determined by the Bureau of Prisons.

Ms. Woolam, I believe there are pending indictments or charges that should be dismissed.

MS. WOOLAM:  Yes, Your Honor.  At this time, based on the sentence that's been pronounced, the government respectfully requests to dismiss Count 2 of the indictment.

THE COURT:  The Court grants the government's motion and orders Count 2 of the indictment to be dismissed as to this defendant and only pursuant to this judgment--I'm sorry--as to this defendant only and pursuant to the judgment.

Let's discuss remaining rights of appeal.  And, Mr. Underwood, I previously served in the Appellate Division at the Department of Justice, so I'm very focused on ensuring that you understand your appellate rights.

So under this plea agreement, you have waived the right to appeal the sentence or contest same in a collateral proceeding, with four exceptions:

Number one, you may directly appeal an arithmetic error at sentencing;

Number two, you may directly appeal a sentence exceeding statutory maximum;

Number three, you may challenge the voluntariness

of your guilty plea; and

Number four, you may claim ineffective assistance of counsel.

Also, if you decide to appeal, your notice of appeal must be filed with this Court within 14 days of the date judgment is entered in your case or within 14 days of the government entering its notice of appeal.

Also and importantly, if you pursue an appeal, you have the right to apply for leave to appeal in forma pauperis, or IFP.  This means you may appeal at no cost to yourself but, instead, at a cost to the government, if you're unable to pay the costs of that appeal.

Ms. Stephens, did you and your client receive a timely copy of the written notice of right to appeal?

MS. STEPHENS:  Yes, Your Honor.

THE COURT:  And did you fully explain to the defendant his appellate rights under this notice and the plea agreement?

MS. STEPHENS:  Yes, Your Honor.

THE COURT:  Does your client have any objections to the appellate rights arising under the plea agreement, including the appellate waiver?

MS. STEPHENS:  No, Your Honor.

THE COURT:  Does your client have any objections to the appellate rights described in this written notice?

MS. STEPHENS:  No, Your Honor.

THE COURT:  Did you specifically explain the 14-day period that applies to the notice of appeal?

MS. STEPHENS:  Yes, Your Honor.

THE COURT:  Okay.  And, Ms. Woolam, did the government receive a timely copy of that notice?

MS. WOOLAM:  Yes, Your Honor.

THE COURT:  Any objections?

MS. WOOLAM:  None from the government, Your Honor.

THE COURT:  This Court did receive and did review a fully executed copy of the notice of right to appeal.  It is dated February 11, 2025.  It bears the signature of the defendant, defense counsel, and this Court.  It is made a part of the record in this case and in any record on appeal.

And, Mr. Underwood, I will caution you that the notice of right to appeal is different than the notice of appeal.  If you have questions about the notice of appeal, please consult with counsel.  She can explain the deadlines and deliverables.

Anything further from the government?

MS. WOOLAM:  No, Your Honor.

THE COURT:  Anything further from the defendant?

MS. STEPHENS:  Only did you want to mark his written statement for his allocution?

THE COURT:  Any objection, Ms. Woolam?

MS. WOOLAM:  No, Your Honor.

THE COURT:  Government's written allocution will be marked as Exhibit E to the sentencing hearing.  Ms. Stephens, you may approach.  It will be made a part of the record in this case and in any record on appeal.

And, Ms. Stephens, are you requesting any momentary pause in Defendant's remand to the United States Marshals so that he may confer with family who have assembled in the gallery?

MS. STEPHENS:  Yes, Your Honor.

THE COURT:  Okay.  Because this is a potentially unwieldy number of people in the gallery, I'll just remind everyone, from the left column to the right column, that, at all times, you're under this Court's instruction to abide the instructions of the United States Marshals and the court security officers.  You are to remain on that side of the gallery bar at all time.  And I will give Defendant 10 minutes to confer with family and friends assembled.  If, at any point, the marshals intervene to remove and remand Defendant, you are instructed to follow and obey all of their instructions.

So I do want to afford Mr. Underwood an opportunity to confer with the many family and friends who have endured this process.  But everyone involved must strictly follow and obey the instructions of these marshals and the court security officers.

With that, you are remanded into the custody of the United States Marshal.

We are adjourned, and the Court will resume sentencings at the afternoon setting.

(END OF HEARING)


I, Mechelle Daniel, Federal Official Court Reporter in and for the United States District Court for the Northern District of Texas, do hereby certify pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.


 _/s/ Mechelle Daniel_                    **DATE**  MARCH 5, 2025

MECHELLE DANIEL, CSR #3549
FEDERAL OFFICIAL COURT REPORTER