UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| VS. | ) No. 2:24-CR-0045-Z-BR-1 |
| | ) |
| COLE PATRICK UNDERWOOD, | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

ELECTRONICALLY-RECORDED PRELIMINARY EXAMINATION
AND DETENTION HEARING
BEFORE THE HONORABLE LEE ANN RENO
UNITED STATES MAGISTRATE JUDGE
JUNE 12, 2024
AMARILLO, TEXAS

FOR THE PLAINTIFF:

    CALANDRA WOOLAM
    UNITED STATES ATTORNEY'S OFFICE
    1205 Texas Avenue, Suite 700
    Lubbock, TX  79401
    (806) 472-7351


FOR THE DEFENDANT:

    CRISTY J. McELROY
    OFFICE OF FEDERAL PUBLIC DEFENDER
    500 South Taylor Street, Suite 110
    Amarillo, TX  79101
    (806) 324-2370


    Proceedings recorded electronically; transcript produced by computer-aided transcription.

_____

DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
Federal Official Court Reporter
1100 Commerce Street, 15th Floor
Dallas, TX  75242
(214) 753-2325

**INDEX**

| Government's Witnesses: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| AGENT NATE NEWLAND | 4 | 47 | | |

| Defense Witnesses: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| LYNDA UNDERWOOD | 53 | 62 | 76 | |

**EXHIBITS**

| Government's Exhibit | Introduced | Admitted |
|---|---|---|
| 1 | 8 | 9 |
| 2 | 8 | 9 |

| Defense Exhibit | Introduced | Admitted |
|---|---|---|
| A | 55 | 56 |
| B | 78 | |

(Proceedings commenced at 1:40 PM.)

THE COURT:  The Court calls Cause No. 2:24-MJ-53-BR-1, *United States of America versus Cole Underwood.*

MS. WOOLAM:  Callie Woolam on behalf of the United States.  Ready to proceed, Your Honor.

MS. McELROY:  Defense is ready, Your Honor.

THE COURT:  All right.  Let me read the Rule 5 admonition and then we will get started.

Under Rule 5(f)(1) of the *Federal Rules of Criminal Procedure*, the United States and its counsel are ordered to comply with their disclosure obligations under the case known as *Brady versus Maryland*, 373 U.S. 83, and its progeny.  The consequences of failing to do so could result in the dismissal of charges, exclusion of evidence, adverse jury instructions, contempt proceedings, and other appropriate sanctions.

Okay.  We are set for both a Preliminary Examination and a Detention Hearing.  Are we proceeding on both?

MS. McELROY:  We are, Your Honor.

MS. WOOLAM:  That's my understanding, Your Honor.

THE COURT:  All right, very good.  Thank you.

And the Government may call its first witness.

MS. WOOLAM:  Yes, Your Honor.

Your Honor, at this time the Government calls FBI Special Agent Nathan Newland.

THE COURT:  Do you solemnly swear that the testimony

you will give today will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  Yes, Your Honor.

THE COURT:  Please take the stand, Agent.

You may proceed.

MS. WOOLAM:  Thank you, Your Honor.

DIRECT EXAMINATION

QUESTIONS BY MS. WOOLAM:

Q.   Good afternoon, Special Agent Newland.  Would you please introduce yourself to the Judge?

A.   Yes.  Your Honor, my name is Special Agent Nathan Newland. I am an FBI Special Agent.  I've been assigned to Amarillo RA since December of 2020.  This is my first field office.  I've been a Special Agent here for the entirety of my career.  I'm sure you're aware of it.  I've worked a lot of different cases, you know, with Amarillo RA.  This would be one of them.

THE COURT:  All right, very good.

Q    (By Ms. Woolam) Thank you.

Special Agent Newland, are you the Lead Case Agent with the FBI on the investigation involving Cole Underwood?

A.   Yes, I am.

Q.   Do you recognize Mr. Underwood in the courtroom?

A.   Yes, I do.

Q.   Could you identify him?

A.   Yeah.  Cole Underwood is right here.

MS. WOOLAM:  And if the record would reflect that the witness identified the Defendant sitting at counsel table.

Q    (By Ms. Woolam) Special Agent Newland, would you please tell the Judge about the nature of this investigation and what brought Cole Underwood under a federal criminal complaint?

A.    Yes.  Okay.  So my office got a call from the Lubbock RA originally.  Jeff Andresen is the Special Supervisor/Special Agent in my office.  So Special Agent Keith Quigley had given him a call and informed him about the case regarding Mr. Underwood. And so Jeff then talked to me and said, "Hey, there's a case out of Ochiltree County regarding Mr. Underwood.  Go ahead and reach out to them."

So I called the District Attorney there that day, talked to him.  He put me in contact with Deputy Wayne Floyd, Chief Deputy out of Ochiltree County.  I arranged to go up there to meet him, and he informed me about the case that they had.  At that point basically the -- the details of that were that he had received a call from the Perryton High School Superintendent who informed him that there was an inappropriate relationship between a coach and a student.

So Chief Deputy Floyd brought in or initially viewed the evidence that the Superintendent gave him.  Then he called in Mr. Underwood and interviewed him.  That interview was recorded. I was able to look at that recording.  And in the course of that interview, Mr. Underwood admitted to having sex with a minor

student at the high school there.  And he also was able to interview the -- this Jane Doe, the minor victim in the case, who also admitted to or who had stated that -- that Mr. Underwood and her had sex in his office.

I talked to the Superintendent.  I talked to Chief Deputy Floyd, and the father of the victim who provided me with the cell phone that was Jane Doe's cell phone.  And on that cell phone we were able to do a -- I guess a complete -- She provided consent to search, and we did a search of the phone and was able to reveal that Mr. Underwood and Jane Doe had had communications on Snapchat.  And ---

MS. McELROY:  Your Honor, I would object to a soliloquy as opposed to a question and answer.

THE COURT:  Okay, yeah.

If you could go ahead and just break it up with some questions.

THE WITNESS:  Okay.

MS. WOOLAM:  Yes, Your Honor.

Q    (By Ms. Woolam) Just going back just a moment, Special Agent Newland, you mentioned Jane Doe.  Have you personally had an opportunity to meet the victim in this particular case?

A.    I have.

Q.    And is that a -- Today, is she 15 years old?

A.    She is.

Q.    And you know her identity.  Is that correct?

A.   Yes, I do.

Q.   For the purposes of this hearing and the criminal complaint, is that individual identified as "Jane Doe"?

A.   It is.

Q.   Thank you.

You mentioned -- You were just about to get into a cell phone that was obtained and turned over to you.  Is that accurate?

A.   Yes.

Q.   Was the cell phone the large piece that really brought this into the FBI's purview --

A.   Yes.

Q.   -- versus previously?

Could you explain what -- what came out of that cell phone?

A.   Yes.  So -- And in reference to this, I guess there's -- there's two different cell phones that I received from Jane Doe.  But the first cell phone was her personal cell phone that her parents were aware of.  That cell phone, again, was provided to me and we did a search of it.  And in those we received many messages that were primarily on Snapchat between Mr. Underwood and Jane Doe.  And they were, I guess, beginning, I guess, flirtatious in nature but leading to, I guess, -- yeah, indicative of a relationship between Mr. Underwood and Jane Doe.

Q.   All right.  And, Special Agent Newland, have you previously had an opportunity to observe what I've previously provided to

the Court and Defense counsel that is marked as Government Exhibits 1 and 2 for the purposes of this hearing?

A.    Yes, ma'am.

MS. WOOLAM:  Your Honor, at this time I would move to admit Government's Exhibits 1 and 2, and I'll intend to have this witness go through them, but I would move to admit them.

THE COURT:  Any objections?

MS. McELROY:  Your Honor, given the extensive information in Government's Exhibit 2, we would ask that the admission be under seal.

THE COURT:  All right.  Any objection to that?

MS. WOOLAM:  Your Honor, the personal identifying information of witnesses and potential victims has been redacted. The victim's name has been redacted.  It doesn't appear -- We took caution on that.  It doesn't appear there would be anything that -- that warrants it being admitted under seal.

MS. McELROY:  Your Honor, the extensive details of the investigation, given the fact that there has been wide media coverage over this, we are concerned that releasing investigation materials could taint possibly any type of jury or voir dire panel in the future.  So for those reasons, we would, again, assert our objection to it being admitted to be viewed by the public or press, that it be admitted under seal or *in camera*, Your Honor, in order to protect my client's ability to have a fair trial or to have unbiased jurors without very detailed

information being leaked to the press or potential venire members before any of that's in crucible at the trial process.

THE COURT:  All right.  Exhibits 1 and 2 are admitted. Exhibit 2 will be filed under seal.  Certainly the Government can move to unseal that after the hearing, if they deem fit.  But for purposes of the hearing today, I assume you will go through a large part of this, but understand counsel's objection as far as providing such detailed written information.

MS. WOOLAM:  Thank you, Your Honor.  And it is our intent to have the witness go through a pretty detailed explanation of Government Exhibit 2, especially to give it context.  If we run afoul of anything the Court believes with that sealing order, please just let us know.

THE COURT:  All right.  Thank you.

MS. WOOLAM:  Thank you, Your Honor.  And may I approach so the witness has copies to review as well?

THE COURT:  Yes.  Yes.

MS. WOOLAM:  Thank you.

Q    (By Ms. Woolam) Special Agent Newland, Government Exhibit 1 that you were looking at is the criminal complaint and affidavit signed in this case for the arrest of Cole Underwood.  Is that accurate?

A.    Yes, ma'am.

Q.    And while that's already a court filing, we marked it for -- for ease of access.  So when I refer to it, I'll talk about

Government Exhibit 1.

Is that a document that you prepared and you swore to?

A.   Yes, it is.

Q.   And is the affidavit in there something that you're personally aware of all the facts in that affidavit?

A.   Yes.

Q.   And are all of those facts true and accurate as to the investigation that you've taken in this case?

A.   Yes, ma'am.

Q.   The Defendant has been arrested and charged with Enticement and Attempted Enticement of a Minor, in violation of Title 18, Section 2422(b).  Are you familiar with the elements of that offense as they are spelled out in the "Affidavit in Support of Criminal Complaint"?

A.   Yes, ma'am.

Q.   All right.  Could you just briefly go over the elements that brought you here to ask this Court to sign a federal criminal complaint?

And we'll walk through it together.  So I'll just ask you: There are four elements to this offense:

First, that the Defendant knowingly persuaded, induced, enticed or coerced or attempted to persuade, induce, entice or coerce an individual to engage in any sexual activity as charged.

A.   Yes.

Q.   What facts led you to believe the Defendant had committed

that first element of this offense?

A.   Well, again, search of Jane Doe's telephone was indicative of the fact that he was enticing her to have and continue to have sex with him.

Q.   Second, that the Defendant used the Internet, a telephone, a cell phone or any facility or means of interstate or foreign commerce to commit that enticement.

You just mentioned a cell phone, but to your knowledge, did the Defendant also use the Internet and social media platforms to do this?

A.   Yes.

Q.   What social media platforms are you aware of?

A.   TikTok, Snapchat.  Snapchat was, I think, especially early on, primary -- primarily the one that was used.

Q.   The third element of this offense is that the Defendant believed that such individual was less than 18 years of age.

As part of your investigation, do you have knowledge that this Defendant would have believed or known that Jane Doe was less than 18 years of age?

A.   Absolutely, yes.

Q.   What facts support that?

A.   Well, one, he knew that she was a freshman in high school, and he originally, I guess, met her at a junior high track meet. And this was her freshman year of high school now, so.

Q.   To your knowledge, did the Defendant have interaction with

her at the school?

A.    Yes, he did.

Q.    And were there communications about Jane Doe's age that you observed between her and the Defendant?

A.    I'm trying to think specifically if they mentioned her age. I don't recall, I guess, specifically ever saying that she was 15 years old, but definitely, I guess, --

Q.    Elusions to?

A.    -- elusions to the fact that she's, yeah, a young high school student.  I mean he was a coach there and talking to her about her sports and her games and things like that, so.

Q.    And I think you just mentioned this, but there was a message -- maybe I'm just adding information -- but is it correct that there was a message where the Defendant said he first recognized her when she was in junior high?

A.    Yes.

Q.    The fourth element of this offense is that had the sexual activity actually occurred, the Defendant could be charged with a criminal offense of a violation of Texas Penal Code, Section 21.11, Indecency with a Child, which makes it a criminal -- a crime to intentionally or knowingly engage in sexual contact with a child younger than 17 or with the intent to arouse or gratify the sexual desire of any person, expose the person's anus or any part of the person's genitals, knowing that a child younger than 17 is present, or cause a child younger than 17 to expose the

child's anus or any part of the child's genitals to the person.

Based on your investigation, do you believe this element of the offense has been met?

A.    Yes.  Mr. Underwood was arrested on state charges initially which that's what, I guess, gave us information to look into the case in the first place, so.

Q.    And, in fact, as you stated before, that sexual activity in this case did actually occur.

A.    Yes.

Q.    So he could be and he has, in fact, been charged with a criminal offense under the laws of Texas.  Is that accurate?

A.    Yes.

Q.    Okay.  Thank you, Agent Newland.

Agent Newland, I'll direct your attention now to Government Exhibits -- Exhibit 2.  This is a 62-page document containing portions of, I believe, your investigation combined with the Ochiltree County Sheriff's Office investigation.  I -- I'd like to just walk through this with you to get a little context for the Court so the Judge can understand what she's looking at.

A.    Okay.

Q.    The first -- And it's Bates stamped at the bottom, so I'll reference those as the page numbers.

The first 12 pages, is that a significant portion of the report provided to you by the Ochiltree County Sheriff's Office?

A.    Yes, it is.

Q.    And that last page, the twelfth page is -- it's entitled "Kori Clements' Statement."  Was that provided, to your knowledge, to Ochiltree County via e-mail?

A.    Yes, it was.

Q.    During Ochiltree County's portion of the investigation, prior to Chief Deputy Floyd being in touch with you, had they interviewed Mr. Underwood?

A.    Yes, they had.

Q.    And is that interview reflected in the first 12 pages of Government Exhibit 2?

A.    I believe that it is, but let me see here.

      Yes.  This is, I believe, Mr. -- yeah -- Cole Underwood's statement with -- I don't know which page this is -- I guess Page 5, and that's Deputy Wayne Floyd's report of that.

Q.    And that's -- Pages 5 through 8 reflect a Q & A portion back and forth with Mr. Underwood and Chief Deputy Floyd.  Is that accurate?

A.    Yes.

Q.    As reflected in that statement, does the Defendant admit that he engaged in sexual intercourse with Jane Doe?

A.    Yes.

Q.    Are there specific details about the sexual intercourse that the Defendant admits to?

A.    I know that in the interview he definitely does and it's recorded.  I'm trying to remember if it says here specifically.

I mean they talked about details of where it took place, whether or not it was protected.  Those types of details were disclosed in that interview.

Q.    And is there a question about whether or not it happened more than ten times?

A.    Yes.

Q.    What was the Defendant's answer to that?

A.    Yes.

Q.    Was there also a discussion about where the sexual activity occurred and whether it was at the Defendant's office at Perryton High School?

A.    Yes.  And it -- Mr. Underwood stated that it was -- all of the instances were -- took place in his office.

Q.    In the first 12 pages, the part that reflects the Ochiltree County investigation, is there also a reflection of Jane Doe's interview with Chief Deputy Floyd?

A.    I believe so.  I'm sorry.  I have to go back and look.  I can't remember.

Q.    Sorry.  I'm not meaning to -- to give you any trick questions.

A.    Yeah.

Q.    Did -- You mentioned in the beginning but we'll just go back to it.  Did Chief Deputy Floyd, in fact, speak to Ms. Doe?

A.    Yes, he did.

Q.    And did she also confirm that sexual intercourse had

occurred with Coach Underwood?

A.    Yes.

Q.    Did she also state that it occurred in his office at Perryton High School?

A.    Yes.

Q.    I'd like to move on to Pages 13 through 30 of Government Exhibit 2.

A.    Okay.

Q.    What do Pages 13 to 30 reflect generally?  What is that?

A.    So this is a number of Snapchats that were sent from Mr. Underwood to Jane Doe.  They came from Jane Doe's phone.  When we did the detailed search of that phone, we were able to recover these images.  This was newer images that I pulled from that that I thought were, again, like I said, indicative of an inappropriate relationship that's going on between Mr. Underwood and Jane Doe.

Q.    So each of these pages reflects essentially a photograph with some texts overlaid.  That's -- That's how Snapchat works, right?

A.    Correct.

Q.    Or this portion of Snapchat.  And so these were snaps presumably sent by mostly Mr. Underwood to Jane Doe --

A.    Correct.

Q.    -- that were located on Jane Doe's phone.  Is that accurate?

A.    Yes.

Q.   And what do those snaps say, if you could just walk through them and what your understanding of them are?

A.   Yeah.  I can go through page by page, but the first one here is he's tracking her period.  He says his period tracker.  It says, "Tomorrow, Tuesday."  There's several times they talk about she got on birth control at the time and also whether or not she's pregnant, but he's tracking her period which, I think, was also, again, indicative of the fact that they're, I guess, sexually intimate in the relationship.

"I wish you were coming home to me."  It's just continued relationship-type talk.

"I love you, wifey.  I'll snap you in 30 minutes."

On Page 17 there it shows that they had been snapping continuously for 161 days.

Q.   And focusing on Page 17, it's -- it's a screenshot that's titled in the top "My Friends" and it lists a number of names. Is "Colton" the individual that would have been listed as Mr. Underwood on her Snapchat?

A.   Yes.

Q.   And the "161" under that indicates that they had been continuously snapping for 161 days.  Is that --

A.   Correct.

Q.   -- what you're saying?

A.   Yep.  Again, he refers to her as "wifey."

"Baby, eating a four-course lunch tomorrow."

"How's class, baby?"

And then "I love you" with the kissy faces.

"The only way it could have been better is if I got to eat you.  How is yours, babe?"

Q.   And that's Page 24 is the one you just read?

A.   Yes.

Q.   "Only way it could have been better is if I got to eat you"?

A.   Yes.

Q.   Just to your understanding, would that have been a sexual reference?

A.   Absolutely.

Q.   And are these the kind of messages that are indicative of using the Internet or cell phone to entice a minor to engage in sexual activity?

A.   Yes.

Q.   The next one is Page 25.  It's redacted for the purposes of this exhibit.  But what does that photograph reflect under the redactions?

A.   It's a picture of Jane Doe.  She's in athletic clothing, and it says, "I'm -- And I'm all yours."

"I'm going to fight for you, protect you and love you for as long as I breathe.  I promise you, and I wish I could keep you warm."

Q.   And those are messages from Mr. Underwood to Jane Doe?

A.   Mr. Underwood, yeah.  This other one here I thought was

also, again, indicative of a relationship and the enticement.

"I'm never going to leave you, no matter the difficulty that lies ahead.  You are my world.  You were designed to complete me. Everything that I've done in this life has been in a divine plan that is more than anything you and I could ever imagine.  I love you more than I love anything on this planet.  You have consumed me and you have given me hope for my forever.  You complete me. I love you so much.  Good luck this morning.  You got this.  I miss you so much, and I can't wait to see you today, wifey.  I love you."

And it's redacted, but he's referring to her as "Mrs. Underwood."

Q.   And that is a snap sent from Mr. Underwood to 15-year-old Jane Doe?

A.   Correct.  Then again, "I love you, wifey."

Q.   Thank you.

Moving on to now Page 31 of Government Exhibit 2, that appears to be a portion of your reporting for your FBI investigation.  Is that accurate?

A.   Yes.

Q.   And generally what does that discuss?

A.   There was a -- Early on in the investigation we had done an administrative subpoena to both Amarillo School District and to Perryton School District to just get the records regarding Mr. Underwood.  And in the course of that, we were, I guess,

informed about and again with what Wayne had provided us -- I'm sorry -- Chief Deputy Floyd provided us the statement from Kori Clements basically stating to the fact that Mr. Underwood had maybe had a history of inappropriate relationships with students. And so we then had an interview with Kori Clements.

She was a former volleyball coach at Amarillo High School, and she just informed us that Mr. Underwood had, I guess, been communicating on social media platforms with the students whenever he was at Amarillo High School and had been communicating, I guess, in a flirtatious manner with some of her volleyball players and she was concerned about it, and that's what the report stated.

Q. And then flipping over to Page 32, there are names redacted from here, but does that document reflect your interview with some of those individuals Ms. Clements identified as potential other victims or individuals that Mr. Underwood was communicating with inappropriately?

A. Yes.

Q. What did your investigation reveal regarding that?

A. Well, in -- I guess in that interview specifically, there's other names of individuals that are yet to be interviewed by the FBI that are, I would say, potential victims but just also people that would probably provide more insight into that. I have not interviewed them yet. But in this interview specifically, the person stated that there was, I guess, some flirtatious texts

that took place and things that the now adult thought were inappropriate for a coach to be sending to a minor student. And she had ---

MS. McELROY: Your Honor, I'm just going to object to the portion -- I'm not understanding whether or not the Agent's testifying that he actually interviewed these people and had that confirmed to you?

THE WITNESS: Yes.

MS. McELROY: That you've seen those texts?

THE WITNESS: This is in an interview and it was, of course, again, Snapchat from the 2017 timeframe. So I do not have those snaps. I just have the statement and the testimony of the witness that I interviewed specifically in this case.

MS. McELROY: The other clarification --

THE WITNESS: Yeah.

MS. McELROY: -- is whether or not this statement was within the context of any kind of investigation that Amarillo High School has done or whether or not this person suddenly appeared now in 2024. With those clarifications, I think we're (Inaudible).

THE WITNESS: Yes. Okay. So specifically with this person, ---

MS. WOOLAM: And, Your Honor, I would -- We can go through the investigation. If there's questions that would be more appropriate on Cross Examination, I would just ask for that

to be the way in which those questions come about.

THE COURT:  Understood.  And to the extent it was an objection, the objection would be overruled because there really aren't a lot of objections that are appropriate in a Detention Hearing.  And so we'll just try to proceed with questions on Direct and then questions on Cross Examination.

MS. WOOLAM:  Thank you, Your Honor.

Q    (By Ms. Woolam) Sorry.  I interrupted you, Special Agent Newland.  You were explaining the nature of this -- this other information --

A.    Yes.

Q.    -- potentially involving other students.

A.    Yes.  So specifically in this interview, talking to this -- the person is now an adult.  They stated as a minor, a friend had confided in her that she also received messages from Mr. Underwood that were, I guess, flirtatious.  You know, "You're pretty," those types of communications to a high school student, to a minor at the time.  And they basically confided -- She confided in her that she had received those messages.  And the interviewee stated that she thought, "Wow, that's interesting. It's not just me that's receiving these messages."

Q.    And based on your investigation, the information provided to you, were those flirtatious and inappropriate messages for an adult educator to be communicating with an underage student?

A.    Yes, and the student believed that to be the case as well.

Q.    Flipping over to Page 34 through the next several pages, I'll let you explain what these -- They appear, also, to be screenshots and photographs involving cellular information.

A.    Yes.

Q.    If you would, please, explain to the Court what each of these pages reflects and its significance in your investigation.

A.    Yes.  So these were something that was provided to me by Chief Deputy Floyd.  He came across them in his investigation, I think, that many of them had come from the Perryton ISD Superintendent, but it was communications by Mr. Underwood or details about Mr. Underwood's social media platforms that he was using to communicate with Mrs. Underwood, and that's what the school had uncovered and then turned it over to the Sheriff's Department there.

Q.    So Page 34 is a screenshot of a message that begins, "Hey, brother, it's Cole."  Who is your understanding of who that message was to or what the intent of that message was?

A.    The -- The intent of the message -- I think this is probably immediately following the investigation into Mr. Underwood is what my understanding was, but it's basically trying to, I guess, reassure people in Perryton and also to try to -- in an attempt, I guess, probably to communicate to Natalie through others that, you know, -- I'm sorry -- to Jane Doe through others that he was caring about her and wanted the best for her.

Q.    And then Page 35, what does -- it shows an invitation to

Snapchat.  Do you -- Do you know who that is -- is to or forwarding?

A.    Actually this is just on -- on a cell phone to find, I guess, Mr. Underwood's still on the social media platform.

Q.    And then Page 36, kind of hidden at the bottom of that page with the photograph, what is that, the significance of that or does that reflect?

A.    Yeah.  That is the CP -- "CPatrickU11" is Mr. Underwood's profile on Snapchat.

Q.    Snapchat.  Page 37 reflects a user's account?

A.    Yes.

Q.    Who would that user be?

A.    Yeah.  Mr. Underwood again.  And I think there's many -- yeah -- different user names, but the same person and you can see the -- the symbol.  That's the purpose of these, I guess, was to show the symbol is the same.  So different user profiles but same person.

Q.    So several different user profiles on the Snapchat platform, all believed to be Mr. Underwood.  Is that accurate?

A.    That's correct.  And I think that there may be other social media platforms as well.  I have to -- I don't know.  I have to look back and see exactly, but yes.

Q.    Pages 39 and 40, and I put this exhibit together, so I apologize if I reversed the order in which they should be in, but could you tell the Court what Pages 39 and 40 reflect?

A.    Give me one moment, please, to look at it again.

Q.    And I recognize the name, "Hey, (blank)," is redacted, but that -- since I did the redactions, I can inform you that was -- that was Jane Doe, I believe.  Correct me if I'm wrong.

A.    So yep.  This -- I'm -- I'm looking at it.  Going back and refreshing my -- It's been -- I've read a lot, so.  Yeah, communication between Mr. Underwood and Jane Doe after ---

Q.    And I apologize.  That -- That -- This might be one to another student.  I'm sorry.  I should have made notes on my redactions.  I'll let you ---

A.    Yeah, let me read it.  I'm sorry.  Just one moment.

      (Pause)

A.    Yeah.

Q.    The redacted name is not Jane Doe just to clarify --

A.    Yes.

Q.    -- since I confused that.

A.    Yeah.  I think it's just -- The reason I included this is -- is to, I guess, show Mr. Underwood's current state, I guess, of after being under arrest, I guess, with -- in this situation, and the basic part of his bond conditions is not to have any contact with Jane Doe in this case, so.

Q.    And, Special Agent Newland, since I'm the one that redacted this document and have now made confusion of it, do you recall that this was a document, it said, "Hey," and it was to another individual, potentially a nickname, that potentially was another

high school student?

A.   Yes.

Q.   But your understanding is this message is referring to Mr. Underwood's feelings about Jane Doe.  Is that accurate?

A.   Correct.

Q.   And 41 and 42 appear to be more just information regarding Mr. Underwood's use of Snapchat profiles.  Is that accurate?

A.   Yes.

Q.   I'd like to flip over to Page 43.  This is a document from the FBI investigative reports, and it discusses a meeting that you, myself and a victim specialist along with Chief Deputy Floyd had with Ms. Doe.  Is that accurate?

A.   Yes.

Q.   Can you tell the Court about that particular meeting and what came out of that meeting?

A.   Yes.  So -- And that meeting is basically a meeting to -- with Jane Doe to inform her that we had been partnered with Ochiltree County and that there would be federal charges filed in the case regarding her and Mr. Underwood.  So we just met with her to inform her of the process and also to put her in contact with the victim specialist.  The victim specialist was able to meet with her and, I guess, get some FBI services available to her.

    But in that -- I guess in that meeting we basically sat down with -- with Ms. Doe and explained to her the tenants of -- of

what makes this a federal crime and why it's a federal crime. And she was able to confirm, yes, that they had communicated on Snapchat in order to arrange for meetings for sex.

Q.    So let's talk about that just in a little bit more detail. They communicated on Snapchat to arrange meetings for sex.  What were -- To your understanding, based on what Jane Doe told you, what was the nature of the arrangements and how -- how did they plan to engage in sexual encounters?

A.    Yes.  So initially, I guess, they would communicate on Snapchat.  There was two communication platforms they were using actually.  There's another one called "ParentSquare" which was a platform for teachers to communicate with students and parents that the school district uses up there.  And what would happen is -- And again, this is -- also came out of meetings with the Superintendent at Perryton ISD.  But basically you can see on camera what would happen is Mr. Underwood would be at the school and Jane Doe would send a message on ParentSquare, say, "Hey, can you let me into the training room in 15 minutes?  I need to do my physical therapy."  And you would see Mr. Underwood then go and prop the door open, again on the security cameras.  And then 15, 20 minutes after, Jane Doe would -- would enter and go into the -- the girls locker room, and she would be in there for like two hours.

So Perryton ISD Superintendent went through and looked at all of the cameras then and saw that she was going in through --

out the back and through the basketball gym into the weight room and then up the weight room stairs and into Mr. Underwood's office.  So the way that they were facilitating that whole thing is that they would communicate on Snapchat to arrange for a time and place to meet.  And then, I guess, to cover their actions and to have a justified reason, you know, that looks apparent on the surface, why they're both at the school after hours, is he was there to let her in the building or he was there maybe and he happened to be there and she asked him to let her in, and he let her in to go do her physical therapy, but they were meeting for sex and arranging it on Snapchat.

Q.   And the federal charge here is regarding using facility means of interstate and foreign commerce to entice, coerce, induce a minor to engage in a sexual activity.  Is -- Does a part of that crime often involved -- involve the active grooming a minor?

A.   Yes.

Q.   Have you been informed of any what we would consider "grooming" behavior in this particular case?

A.   Yes.

Q.   And what is that?

A.   Well, I would say that, again, if you look at -- And even the pictures that are in this exhibit are indicative of it, but if you look at the history of their communications, and there's a message that we were able to receive where Mr. Underwood states

that he first saw her at a junior high track meet and would go to the junior high apparently to -- to bump into her, hoping to bump into her, and then continued to build a relationship with her throughout that summer between junior high and high school. She went away for a church camp for a while. He sent her a message saying that he, you know, was basically upset with her being away and everyone could tell that his attitude changed because she was gone and then that she came back and their relationship grew closer and closer. And he allowed her, he said, to, I guess, develop in her own time and to then having a relationship, and so as he continued to use social media to build a relationship of trust to get closer to her and then eventually leading to a sexual relationship.

Q.   And the message that you referred to on Snapchat where he's saying he first saw her at a junior high track meet and knew that they would be together essentially, is that reflected on Pages 56 and 57 of Government Exhibit 2?

A.   Let me go there. Yes, although I -- I guess I want to clarify that this, I don't believe, is Snapchat. This is from the secondary phone that was provided to Jane Doe by Mr. Underwood. On this phone they are communicating using an encrypted messaging app. This is after his initial arrest, and I think they had moved off of Snapchat because he knew that Snapchat was then compromised. So when he was contacting her again after being, you know, breaking his bond basically to

communicate with her, they used an encrypted messaging app to hide that they were communicating. But she would take screenshots basically or copy and paste those messages so that she could save them for herself to read later, and then we happened to get those messages.

Q.    Special Agent Newland, --

A.    Yes.

Q.    -- thank you for clarifying that. And to add, just -- so this -- the screenshots reflected on Pages 56 and 57 are the photographs. That is a phone you collected from Jane Doe. Is that accurate?

A.    Correct.

Q.    And she said that after being arrested by Ochiltree County, --

A.    Yes.

Q.    -- the Defendant provided her this phone so they could continue to communicate. Is that accurate?

A.    That is accurate.

Q.    All right. Thank you. We were talking about the grooming activity and we went to that message. But was there other activity that Ms. Doe told you about in terms of using her family dynamic or things going on in her life to get --

A.    Absolutely, yes.

Q.    -- get friendly with her?

A.    And Mr. Underwood stated this as well when he talked about

how their relationship developed in my interview and Chief Deputy Floyd's interview with him that Jane Doe was going through a difficult time with her family situation at home.  And I think Mr. Underwood stated, also, he was going through a difficult time with his as well.  So they, I guess, were able to confide in one another about their difficult situations, and definitely the use of social media facilitated that.

Q.   Thank you.  Still speaking about your -- your discussions with Miss Doe and, I guess, including what Mr. Underwood may have admitted to you, did you learn about the sharing of sexually-explicit photographs and videos?

A.   Yes.

Q.   What did you learn about that?

A.   Jane Doe has -- has told us that there are Snapchats, that they had sent sexually-explicit photos, nudes, back and forth, and that she had sent nudes to Mr. Underwood and Mr. Underwood had sent nude pics to her.

Q.   And with Jane Doe being 15 years of age, would that be child pornography under federal law?

A.   Yes.

Q.   And did Ms. Doe indicate she sent the -- the sexually-explicit photographs because she believed Mr. Underwood wanted her to send those?

A.   Yes.

Q.   To date, have we located any specific sexually-explicit

photographs or videos?

A.    We have not located any specific photos yet.  There's pending searches still.

Q.    Thank you.  I believe Page 45 of Government Exhibit 2 is the beginning of your report that just reflects generally your interview and arrest of Mr. Underwood.  Is that fair?

A.    Yes.  If you'll give me one moment to look at it, it's 45?

Q.    That's correct.

A.    Yeah.  This is my arrest -- documentation of the arrest of Mr. Underwood for clarification, also.  So he was interviewed subsequent to his arrest.  I -- I put a note in here that that happened, and just made a brief snip of that, but the full details of that interview have not yet been documented on the FBI system.

Q.    All right.  Would you, please, tell the Court about your arrest of Mr. Underwood and interview with him?

A.    Yes.  So it was June 4th, I believe.  Yeah, June 4th.  We had received the arrest warrant and basically had surveillance on where we knew Mr. Underwood was staying, at his mother's house. We did surveillance there and basically waited for him to leave. And the reason we did that is we wanted to make sure that his cell phone was on him so that we could hopefully procure some evidence, also, of his continued communications with Jane Doe.

So we executed the search warrant, and it was actually in conjunction with the Amarillo Police Department.  Amarillo Police

Department did -- conducted a traffic stop and informed Mr. Underwood that he had a federal arrest warrant.

So at that time actually his mother, Ms. Underwood -- I allowed Mr. Underwood to make a phone call to his mom on the side of the road. He called his mom who came, and we made arrangements to get Mr. Underwood's vehicle back to his mother's house and then proceeded to the FBI Office.

Once we were there, we had an interview. In that interview Mr. Underwood did admit to having sex again. He -- You know, I informed him that we had seen the video of the Ochiltree County's interview and already had his admission to it. So it was no surprise to anyone or anything the fact that we had that information, but Mr. Underwood said, "yes," that that's -- the previous statements that he made were accurate and that he had had sex with her. And, again, the details of the fact that they were communicating on Snapchat, he confirmed that that was the case.

Q. Did he tell you whether or not he had been in contact with Doe since his prior arrest?

A. He said that there had been no contact.

Q. And previously in your meeting with Doe, did she make any indications whether or not there had been contact?

A. She said that there was not contact.

Q. She also said that there was not contact?

A. Yes.

Q.   Did you discover anything that indicated there was, in fact, contact between Underwood and Doe after his prior arrest?

A.   Yes, and we already had suspected that there was continued contact, but we were able to -- Yes, we have evidence documenting that continued contact, and some of it's in this -- in the file here.  I can't remember what page of it.

Q.   Did you also learn any information -- Sorry.  I'll go back to, Special Agent Newland, the interview with Mr. Underwood.

     Was there anything else he told you in the interview that he was trying to -- to hide from you or cover up?

A.   Well, I think that probably the cell phone from the original arrest or -- After his original arrest, he switched cell phones, switched a lot of the social media platforms, like I said; the fact that he started communicating on TikTok then.  I -- I advised Mr. Underwood like -- I think like three times.  I mean like, "We're going to find this, you know, information if it's there."  And he was adamant, "No, we haven't had no contact."  And sure enough, you know, like I said, we -- we found that they were communicating on TikTok.  They were communicating using the encrypted messaging app and that he had provided that cell phone and, like I said, switched cell phones.  The original cell phone which would have a lot of evidence as well is gone.

Q.   Did Mr. Underwood tell you about his feelings about Jane Doe?

A.   Yes, he did.

Q.    What -- What did he describe to you?

A.    Well, in my interview with Mr. Underwood and also Deputy Floyd's interview, he -- he's, you know, told me and I think that he's sincere in his statement that this -- that he's in love with Jane Doe, and I guess he -- he also wanted to make sure I understood that like or -- or wanted to ascertain whether or not Jane Doe had ever said it was forced or anything like that.  I'm like, "No."  And I informed him.  I said, "No, Mr. Underwood.  It's -- It's never been -- It's never -- There's been no accusation of, you know, anything forced or anything like that.  It was consensual, but Jane Doe being a minor doesn't have the ability to give you consent."

Q.    And still -- still kind of referencing Government Exhibit 2, was there a point where you learned about a letter that Ms. Doe had written, intended to be mailed to Mr. Underwood's mother?

A.    Yes.

Q.    And is that reflected in the report on Pages 47 and 48?
      And then there's photographs of an actual letter.  Is that accurate?

A.    Yes.

Q.    Can you explain what that letter is and how that came to be?

A.    Yes.  So -- So the letter -- According to Jane Doe, the letter was written or the instructions of how to write the letter and to keep -- details to put in the letter were sent to her from Mr. Underwood.  Evidence of that is on his phone and on her phone

that he provided to her.  In fact, the entire letter, pictures of it were on Jane Doe's telephone that he had provided to her.  So we were aware of the letter before we actually had the evidence -- the actual copy of the letter, but it's exactly like word for word verbatim things that he told her to say and then things that she actually wrote in the letter.  And the letter basically says that -- It's a -- It's addressed to Lynda Underwood and states that, one, that she's sorry for the -- I guess the grief that this situation has caused and that her and Cole are in love and that they want to be married and that this -- The letter states that she, Jane Doe, wants to leave Perryton and be married to Cole and leave Perryton.

Q.   And it's your understanding that Doe wrote that letter at Mr. Underwood's direction and instruction, correct?

A.   Yes.

Q.   Was that -- Where did you locate the letter that's actually photographed in Government's Exhibit 2?

A.   She had it in her possession, Jane Doe did.  She provided it to me.  She told me she fully intended on mailing that letter. She didn't have any stamps.  She was actually Googling where to buy stamps other than the Post Office, trying to get it -- that it was already sealed and ready to mail.  It needed a stamp.  And that was being sent at the time basically that we arrested Mr. Underwood.

Q.   Government's Exhibit 2, Pages 49 and 50 and it looks like

51, 52, does that reflect the charge for sexual assault of a child in Ochiltree County of Mr. Underwood as well as his bond conditions when he was released on bond?

A.   Yes.

Q.   And specifically after that arrest, was Mr. Underwood ordered to have no contact with Miss Doe as part of his conditions of bond?

A.   Yes.

Q.   And based on what you've said and to your knowledge, did he, in fact, violate those conditions?

A.   Yes.  He both met with her in person and provided her that cell phone and then continued to communicate with her on the encrypted messaging app and on TikTok on that cell phone and instructed her to keep it hidden and keep it safe, away, so that basically they could continue to communicate.

Q.   Government Exhibit 2, Page 53 is a "Consent to Search" that describes an iPhone 15.  Is -- Which phone is the iPhone 15 that this "Consent to Search" was for?

A.   This was the one that Mr. Underwood provided to Jane Doe after his arrest.

Q.   And is -- Just generally because it's an element we have to meet, is that a phone that is a facility, a means of interstate and foreign commerce?

A.   Yes.

Q.   It operates as a computer and it was not something

manufactured solely within the State of Texas?

A.   Yes.

Q.   All right.  Just walking through a few more things -- I think I'm done with Government Exhibit 2 and explaining the contents of that, but I'd like to walk through the -- the timeline relatively quickly of Mr. Underwood being told to not contact Doe and his continued contact.

What was the first instance, to your knowledge, of when Mr. Underwood was told not to have any contact with Ms. Doe?

And you don't have to recall a specific date.  I'm sorry.

A.   Yeah.  That's fine.  The first time he was told not to would have been from Perryton ISD from the -- and I'm not sure exactly. I want to say like -- I have it.  I'd have to look back, but March timeframe maybe he was told not to have any communication with her.

Q.   Would that have been March of 2024?

A.   Yes.

Q.   And to your knowledge, did he continue to have contact with her after that date?

A.   Yes.

Q.   And was it the same kind of contact, this sexual in nature contact?

A.   Yes.

Q.   When was the next time that Mr. Underwood was told he could not have contact with Miss Doe?

A.    Well, I think that probably in the -- in the bond.  That was part of the bond conditions after he was released because he was told not to have contact with the school.  He was continuing to have contact.  It was taken to Ochiltree County -- Ochiltree County, and he was arrested shortly after that and, again, told not to have contact.

Q.    And sometime in between the school telling him "Don't have contact with her" and him being arrested, was he still during some portion of that time employed with Perryton ISD?

A.    Yes.

Q.    And during that time period, was more information discovered that led to his termination from Perryton ISD?

A.    Yes.  And I'm -- I'm not sure if he was actually terminated.  I know that he didn't work, but I think he may have resigned in lieu of termination, but yes.

Q.    But left?

A.    Correct, yes.

Q.    Does not return to the school?

A.    Yes.

Q.    Thank you for that clarification.  And his arrest by Ochiltree County, was that approximately April 23rd of 2024?

A.    Yes.  I think he was arrested on the 24th, I think, or -- but, yeah, --

Q.    Okay.

A.    -- or the 25th.

Q.   And -- And, again, after that date and then given bond conditions, he still continued to communicate with her.  He bought her a secret cell phone and engaged in covert conversations.  Is that accurate?

A.   Yes.

Q.   What was the platform that they moved to to hide their communications after he was released on bond?

A.   So they were communicating on TikTok.  And then on TikTok you can see, again, that they are -- you can tell that they're moving their conversations to another platform, and it turns out it was an encrypted messaging app.  It's Signal app, if you're familiar with it, but it's ---

Q.   Is that an end-to-end encrypted platform?

A.   It is.  And one of the features of Signal app -- So Signal app is -- it's a -- What it means to be end-to-end encrypted is that basically you need an encryption key on both ends that Signal app has.  So if you -- if you send a message and you don't have that encryption key, you wouldn't be able -- you wouldn't be able to read the contents of the message.  So even if the message is intercepted, it's -- you could get no information out of it.  So end-to-end encrypted, and then one of the features is that it has disappearing messages.  You can set the time on what timeframe you want a message to be there for but once it's -- once it disappears, it's -- it's -- it's known that basically it's a way of communicating where -- basically a secure platform

where law enforcement or otherwise would not be able to get the content of those messages unless you had one of the devices.

Q.   During your investigation, did it appear that the Defendant was using any other minor students to aid him in his manipulation of Doe?

A.   Yes.

Q.   Could you, please, explain that?

A.   Yeah.  So one, I think, back -- going to the first, there was some -- one of those original messages that you asked me about that was provided to us was him communicating with other minor students to, I guess, relay messages to Jane Doe.  But then also in order to provide her with a cell phone and continue to communicate with her and meet with her, there was another minor student that was facilitating that at the behest of Mr. Underwood.

Q.   And that was in part after he was arrested and released on bond conditions by Ochiltree County.  Is that accurate?

A.   Correct.

Q.   During that period of his release and bond, was he living at the residence with his mother, Lynda Underwood?

A.   Yes.

Q.   Did you -- Did you locate any messages at any point that indicated he was hiding behavior from his mother?

A.   Yes.

Q.   What kinds of messages indicated that?

A.    So there was actually a message, I think, from his mother to him where -- she basically told him, "You've been on the path for a long time.  You're not messaging the girl, are you?"  And he's like, "No.  I'm just, you know, really upset with the situation."  But he, of course, was continuing communications with Jane Doe.

Q.    Is the Defendant now undergoing a divorce or has he divorced his wife?  His spouse?

A.    I'm not sure what the final -- it that's finalized, but, yes, he is going through a divorce or has recently divorced his spouse.

Q.    And the Defendant doesn't have any children that you're aware of himself, does he?

A.    No.

Q.    At the time of the Defendant's employment with Perryton ISD, are you aware that his wife was also an employee with Perryton ISD?

A.    Yes.

Q.    And to your knowledge, is the Defendant estranged or -- or distanced from any family members?

A.    Yes.

Q.    Which family members?

A.    I believe his sister.  He's, yeah, estranged from his sister.  I think both of his parents are here in the courtroom today, so.

Q.    Is there information that leads you and your investigation

to believe there may be other potential victims out there?

A.   Yes.

Q.   And are you intending on follow-up interviews with specific -- with regard to that?

A.   Yes.

Q.   I'd like to talk about Jane Doe's -- what Jane Doe has informed you and your agency and other investigators about her feelings towards Mr. Underwood.

Did Jane Doe discuss how she felt about Mr. Underwood and what he did to her in terms of grooming sexual abuse and continued contact?

A.   Yes.

Q.   What did she say?

A.   During the course of the investigation, she's kind of gone through a whole -- as you can imagine, being a minor victim, she has a whole range of emotions.  I think she was 100 percent absolutely in love with Mr. Underwood.  I think, according to her, he took her virginity.  So I think that being a minor at her age and also the difficulties she was going through at home, she probably, through Underwood's -- Mr. Underwood's grooming of her, probably was, you know, very much in love with him and confided in him and built a strong bond with Mr. Underwood.

However, I would say that after his arrest, she did make a statement that she felt like she was free of it and out of the situation.  I think she probably knows, too, that this is wrong

and she shouldn't be doing it, you know, even though she probably has strong feelings for him.  She, I guess, wanted away from it.  And she told me also that she couldn't believe she fell for it twice because after his arrest and then when he recontacted her and continued communication with her, she fell right back into it again and was, you know, talking about running away with him and getting married.

So I think she's had a whole range of emotions there.  I think that at present she's doing really well, and she's -- she was wanting to completely get away from the situation.  I just think that Mr. Underwood had such a hold over her that it was difficult for her to do that.  She did say that she wanted to ghost him, like stop texting him, but she was worried to do so.

Q.    What did she indicate she was worried that would happen if she stopped talking to him?

A.    That Mr. Underwood would hurt himself.

Q.    You mentioned that she said she -- there was a period where she was back and forth and thinking she loved him and wanting to run away and marry him.  Was that even as to recent?

A.    Yes.  As of the date that I arrested him, she was, like I said, planning on running away with him and getting married at Mr. Underwood's, I guess, encouragement or enticement to do so.

Q.    Do you believe that if Mr. Underwood were released, it would have a negative impact on the health and well-being of Ms. Doe?

A.    One hundred percent.

Q.    Why do you believe that?

A.    One, she's -- Like I said, she is a minor victim, and I think that because of the extent to which Mr. Underwood has been able to groom her and spend so much time and build such a strong bond with her, it -- as you can imagine, the -- her being in high school in a small town and the news and the media and everything regarding this situation has ruined her world of Perryton.  You know, a high school student athlete in that town and a very difficult situation for her to go through, and she wants to be rid of it and have it behind her.  She's going through it right now.  But with the continued contact with Mr. Underwood, she's not -- she was, I guess, not able to heal and -- and allow that process to take place.  And I think that it started to happen and then once Mr. Underwood's recontacting her, she fell right back into it.  And she's even expressed the fact that she's, you know, surprised at herself for doing that and that, I think, that she's -- absolutely that would happen again, and I think she knows that, and she -- So, yes, I think that right now she's at a place where she can begin and continue the healing process.

Q.    Did others, including her family members or other people in the community, express concerns during the period of time when Mr. Underwood was not in custody about safety issues, monitoring devices, et cetera?

A.    Absolutely.  Obviously, her parents are very worried and concerned with all of -- all of that and Mr. Underwood being out

and being able to continue to have contact with Jane Doe.

Q.    Based on your investigation and everything you know, do you believe that there's a scenario where Mr. Underwood would get out of jail, be released from this Court, and not attempt to contact Miss Doe?

A.    No.

Q.    And why do you believe that?

A.    Because I think that Mr. Underwood -- still to this moment, he has -- he's in love with Jane Doe, and he has, I think, showed a pattern that he continues to contact her and, you know, regardless.  I mean he's told her in the messages that "No matter what, I'm going to fight for you.  I'll be there for you," and wants them to run away together and be married.  So even after everything, even after being arrested and knowing that, you know, the -- I guess the consequences of that, he continues to do it, and I think he will because he thinks that, as he states, that it's God's divine plan for them to be together.

Q.    And thus far, he's -- he's taken every effort necessary to continue his communication and hide it.  Is that fair and accurate?

A.    Yes.

Q.    Do you believe that there's any condition or set of conditions that this Court could fathom -- and you can attempt to be creative here -- that would prevent Mr. Underwood from being a flight risk or a danger to the community if released?

A.    No.  I think, like I said, Mr. Underwood has repeatedly made attempts to contact Jane Doe in this case, and I think that he'll continue to do that.  And like I said, there's already talks of them basically running off together to be married.  So I think that that still would be his primary goal.

MS. WOOLAM:  Thank you, Special Agent Newland.  Defense counsel will likely have some questions for you.

THE COURT:  You may proceed.

MS. McELROY:  Thank you, Your Honor.

CROSS EXAMINATION

QUESTIONS BY MS. MCELROY:

Q.    You indicated that in your estimation there were no conditions that the Court could set that would address the flight risk.  Is that accurate?

A.    That's accurate, yes, ma'am.

Q.    My client has no passport.  Are you aware of that?

A.    I was not aware of that.

Q.    My client has absolutely no ties to any other jurisdiction and his entire family lives basically in Amarillo, Texas.  Are you aware of that?

A.    I was aware that his family was here, yes.

Q.    Are you aware of whether or not my client has ever had any arrests for any offense other than what we're here for?

A.    I'm aware of that, yes.  He's -- He has ---

Q.    There's no criminal history.

A.   Right.  He was a schoolteacher, and I understand he on paper has a clean record, yes.

Q.   So there's no instances of not appearing for court or escape or bond jumping.  Is that correct?

A.   Correct.

Q.   In reference to the types of rules or terms that could be met, would you agree with me that that would be the purview of the Judge?

A.   Yes.

Q.   Let's talk briefly about these other allegations with people that you talked to.  I believe you referenced Miss Clements.  Is that accurate?

A.   Correct.

Q.   Now Miss Clements, she's -- was it your testimony that she had had something to say back in 2017?

A.   I have to go back and look exactly the year.  I know that this other student I talked about, that was the 2017 timeframe, and I think that it's approximately that same timeframe that we're talking about with Miss Clements, correct.

Q.   All right.  Now Miss Clements was a volleyball coach at Amarillo High School.  Is that right?

A.   Yes.

Q.   And so this was back in 2017 but, yet, there -- When you -- You said you had issued a subpoena to both of the schools, right?

A.   Yes.

Q.   Was there any kind of disciplinary action that you saw within those records that indicated that Mr. Underwood had been sanctioned for inappropriate conduct?

A.   He was put on administrative leave on -- in both school districts, pending an investigation.  In Amarillo School District, he was reinstated.

Q.   And so basically there wasn't any kind of punishment or any finding that those things were accurate.

A.   The School District said that they did not find anything that would, yeah, be anything other than innocent communications.

Q.   You said that you would pursue any kind of other leads.  Do you have specific names of people that have come forward since this investigation that you intend to pursue?

A.   Yes.

Q.   And what are those names?

A.   I don't have them written down with me today, but I can provide them to Assistant U.S. Attorney Woolam.

Q.   Are those people that have, you know, come recently out of the woodwork, so to speak?

A.   In some cases, yes.  Others of those were identified by other people who have not come forward themselves but were -- I was told to talk to them, if that makes sense.

Q.   But as far as your investigation shows from your subpoenas, there were no other allegations and no substantiation by the districts on either Amarillo Independent School District or

Perryton School District.  Is that accurate?

A.    If I understand correctly, in both cases there was no specific allegation to misconduct.  It was just simply that "this appears to be inappropriate communications" and put on leave, pending an investigation to whether or not it was inappropriate communications.

Q.    And then ---

A.    Obviously, in the case -- in the secondary case with Perryton, it turned out that there was, indeed, inappropriate contact with a student in that investigation.

        MS. McELROY:  We'll pass the witness, Your Honor.

        MS. WOOLAM:  No further questions for this witness, Your Honor.

        THE COURT:  All right.  You may step down.

        THE WITNESS:  Thank you, Your Honor.

        THE COURT:  Does the Government have other witnesses?

        MS. WOOLAM:  No other witnesses, Your Honor, and no other documentary evidence.  I would like to, by way of proffer, state what I believe the advisory guideline range as to sentencing is.  I think it's relevant to the case as a whole because it's what the Defendant would -- would be informed that he's potentially looking at.

        So just regarding the *U.S. Sentencing Guidelines*, pursuant to Sentencing Guideline 2G1.3 which is Enticement of a Minor, I believe the Defendant would be looking at a Base Offense

Level of 28, a plus 2 for being a person with whom the victim was under the care, custody or control or, alternatively, abusing a position of trust; a plus 2 for undue influence where there's a rebuttable presumption in a case where a defendant is ten years or older than the victim which he was; a plus 2 for use of a computer; a plus 2 for commission of a sex act; a plus 5 for repeat and dangerous offender under Section 4D1.5 of the guideline range which would come to a Total Offense Level of 41. The Defendant has a Criminal History Category of I.  And I think at a trial the Defendant would be looking at an advisory guideline range of 324 to 405 months.

If the Defendant were to plead "guilty" and accept responsibility, he would be reduced on that by three levels and be looking at a guideline range of 235 to 293 months.

However, the investigation is ongoing, and I believe there's a good chance that Production of Child Pornography could be an additional charge or factor taken in this case.  If that's the case, the Defendant's guideline range would cross-reference to 2G2.1.  He'd be looking at a Base Offense Level of 32; a plus 2 for a victim who had not attained the age of 16; a plus 2 for commission of a sex act; a plus 2 for care, custody or control or abuse of position of trust; a plus 2 for use of a computer, and a plus 5 for repeat and dangerous sex offender under 4B1.5, resulting in a Total Offense Level of 45 which would result in an advisory guideline range of life or if he accepted responsibility

under that framework, 42 would be the offense level which would be a guideline range of 360 months to life if he were to plead "guilty" under that framework. I state those levels to show the seriousness of what the Defendant is looking at and the conduct that he has engaged in.

And other than that, Your Honor, the Government has no additional evidence or proffer. We would make an argument as to detention.

THE COURT: All right. I'm trying to figure out if this is a time to take a break or not.

Does the Defense have witnesses or evidence by way of proffer?

MS. McELROY: Defense has evidence by way of proffer, Your Honor.

THE COURT: All right. You're not held to this, but how long do you think that may take? Are we talking ten minutes or are we talking an hour?

MS. McELROY: In between there, Your Honor.

THE COURT: All right. Let's go ahead and take a ten-minute break then. Court will be in recess.

COURT SECURITY OFFICER: All rise.

(Court recessed from 2:56 PM until 3:07 PM.)

COURT SECURITY OFFICER: All rise.

Please be seated.

THE COURT: All right. You may proceed, Ms. McElroy.

MS. McELROY:  Thank you, Your Honor.

Your Honor, at this time Defense would like to call Lynda Underwood to the stand.

THE COURT:  All right.  You can stop, and raise your right hand to take the oath.

Do you solemnly swear that the testimony you will give today will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

THE COURT:  All right.  Go ahead and take the stand and watch the stairs as you come up.

                    DIRECT EXAMINATION

QUESTIONS BY MS. MCELROY:

Q.   Will you state your full name for the record, please?

A.   Lynda Hunnicutt Underwood.

Q.   How is it that you know Cole?

A.   He's my son.

Q.   So we're going to assume you've known him his entire life.

A.   I have known him his entire life.

Q.   Okay.  What kind of work do you do, ma'am?

A.   I'm a Behavior and Systems Coach for Amarillo ISD.

Q.   And how long have you done that work?

A.   I've been with -- in the Behavior Department for five years. But before that I taught at the Clements Unit and then before that I taught 20 years in Perryton ISD as a Reading

Interventionist.

Q.   Okay.  So during the time that Cole has been acting as a teacher, has he had a good relationship with the folks that he worked for that you know of?

A.   Absolutely.  He's been in high esteem.  I can't tell you how many letters and e-mails and calls I get from people I don't even know saying what an outstanding child he is and what a great job he's done, the rapport he has with parents, students; exemplary record.

When the tornado hit Perryton, he was the voice of Perryton.  He -- He -- All the other administrators, the Superintendent, everybody was out of town, and he opened the shelters and started the food drive and did all of that all on his own.

Q.   Now you, of course, have been in the courtroom this whole time, and you've been with your son during this entire incident; correct?

A.   Correct.

Q.   So let's go back in time for a minute.

You -- You helped him to make bond.

A.   I did.

Q.   And then he moves from Perryton to your home.

A.   He did.

Q.   All right.  And where -- where do you live, ma'am?

A.   8406 Edenbridge in Westover Village.

Q.   Okay.  If Cole were to be released, would you be willing for

him to live with you?

A.    Absolutely.

Q.    Now he was selling his home because he doesn't plan to return to Perryton.  Is that accurate?

A.    That's accurate, yes.

Q.    And during the time that he was living with you, did he endeavor to get work?

A.    He did.  He got a job instantly with Amarillo Furniture Exchange.  And, in fact, I sent a letter verifying his employment.  And the parole or probation officer -- I'm not sure what the name of who that was that called me -- weirdly when he called, she had brought me lunch that day because I've, obviously, been very upset over this, and she was there and he was able to talk to the owner of the company while on the same phone call.

          MS. McELROY:  And, Your Honor, that reminds me.  We would like to ask for admission of the Defendant's Exhibit No. 1 for purposes of this -- or Exhibit A -- pardon me -- for purposes of this hearing.  It's a letter from the person in charge of hiring, Allison Hayes, at Furniture Exchange.  Basically it indicates that he would be eligible for rehire and is in their warehouse department, Your Honor, and not in a public capacity.

          MS. WOOLAM:  No objection from the United States, Your Honor.

          THE COURT:  All right.  Government's -- excuse me --

Defendant's Exhibit A will be admitted.

MS. McELROY:  Thank you, Your Honor.

Q    (By Ms. McElroy) Now during the time that you've known Cole, during his growing up years, was he ever in trouble?

A.    Never.  In fact, as a teacher, that's always your fear is to have, you know, a student that is yours that is terrible, and he got "Best Citizen Boy" from kindergarten through 12th grade.  He was always a leader in the school, always a leader in college even, President of his fraternity.  He's never drank.  He's been the easy kid.  I have two, and I have one that bucks every rule available and I have Cole that's always just done the right thing.

Q.    During this time that you've observed him, you remarked that he does not drink.  Does he have any substance abuse issues that you're aware of?

A.    Absolutely none.

Q.    This allegation of a relationship with a student, you're aware of this.

A.    I am.

Q.    And, in fact, you're very aware because the FBI showed up to your home.  Is that right?

A.    Yes, they did.

Q.    And they searched your home.  Is that right?

A.    They searched every drawer, every nook and cranny.  Like 12 people showed up on my cul-de-sac, walked the block to make sure

everybody in my neighborhood knew, and it may be the most humiliating experience in my life.

Q.   Now did you try in every way to cooperate with the FBI?

A.   Absolutely I did.

Q.   Okay.  And did you provide them with any devices that you thought they would be interested in?

A.   Yes.  In fact, when they came in, I already had them setting there, what I assumed that they were wanting.  And then after the hours' long search, I'm going to say two to three hours they were at my home, they only took what I had laid out for them.

Q.   Did they question you about receiving a letter from the complaining witness victim?

A.   They did.

Q.   And did you indicate that you had not received such a letter?

A.   I did.  In fact, I was shocked that there would even be such a letter.

Q.   Did you check your mailbox?

A.   Yes, I did, and it has not arrived.  And I know the Defendant's parents, but I do not know the -- I mean the girl in question.

Q.   All right.  Now it was discussed prior with the Agent on the stand that you had in some kind of communication asked Cole whether or not he communicated with the complaining witness victim.

A.   I did.  In fact, I kind of went back to -- reverted to when my kids were in junior high and high school.  I was asking him like, "What are you doing on your phone?  What are you doing on your phone?"  Because I was very aware of the -- the bond from Perryton.

Q.   Okay.  If the Judge were to set certain rules and one of those rules were that he not be allowed to have any phone or that any phone that he might use would be unable to link with any kind of Internet service, would that be something that you would supervise and see that that was going on?

A.   I would just say he doesn't need a phone.  If a piece of furniture hit him at the warehouse, they have a phone there that they could call out.  And at my home if he wanted to speak to my mom or any of my family members, he could use my phone.

Q.   There's always a concern about communications, and most of those communications are generally done over the Internet.  Do you have Internet at your home?

A.   Yes, I do.

Q.   And is it password protected?

A.   It is password protected.

Q.   If the Judge so instructed, would you be willing to make sure that your password protected Wi-Fi was not shared with Cole?

A.   Absolutely, and that's been done.  He can revert back to junior high and high school.  I changed the passwords often depending on what chores were done or what homework was done or

what grades hadn't been turned in.  As a teacher, I was -- I was pretty strict as a parent, so -- and I would give it to him. Then this time he would never have it ever.

Q.    If the Court was of a mind and decided that it was necessary to know where Cole was, would you have any objection to a GPS monitor, leg monitor, that he be ordered to wear and to make sure that he continued to wear that monitor?

A.    Absolutely I would make sure.  He could wear one on both legs, both arms, and put one on me, if that's necessary.

Q.    Anything -- As far as it goes, he would be willing to go to work.  Do you have any objection to, if the Court were to consider a travel restriction, to restrict his ability to go anywhere other than from your home and no farther than where he would need to travel to go to work?

A.    I have no problem with that.  My mother lives in Channing, but she's 88 and very healthy and drives in to Amarillo, and she could just come see him at my house.

Q.    What about any type of supervision that you can provide?  I know that you're probably -- Are you working now?

A.    I'm on summer break, and I'll be here.  I've also already made arrangements.  My sister is a private criminal investigator. She lives about a mile from my house.  And if I had to be out of town for some reason or go to a workshop or -- or a doctor's appointment, she works from home and she said she would gladly come stay and -- and be at my home at any time that I could not

be there.  And my mother has also volunteered to do that, also.

Q.    So you, your sister, and your mother could provide pretty much 24-hour supervision around the hours that he would be required to work?

A.    Absolutely.  And I also have a large extended family.  Those are just two, but I'm sure any of them would be willing to do that.

Q.    You would -- You would also be aware that the Court might require that he not be allowed to attend certain functions or be around anyone under the age of 18.  Would that be an issue?

A.    No.  In fact, my youngest great nephew is 18.  All of our immediate family is older.  And then while Cole's been home with me this time, we haven't gone to church services.  We've only watched them on TV just to not be out in public.

Q.    Would you have any problems enforcing any kind of curfew or restrictions that the Court would set?

A.    No, not at all.  I mean I'm old and I'm boring, and so that's easy.  And then he's young but very boring.  He's always been, you know, just -- goes to bed early, works, goes home.  I mean I don't think it would be hard, but I certainly would enforce whatever the Court wanted me to do.

Q.    And we talked previously about the requirements of being a third-party custodian?

A.    Yes.

Q.    And you understand that if the Judge were to set certain

rules of supervised release, that that puts you in a position where you've told the Judge that you're going to call Probation and say, "Cole violated that," knowing full well he's going back to jail?

A.   I do know that, and I absolutely would -- would call them and -- and take care of that because I -- one thing I do hate is being lied to and I would take that to heart.

Q.   Now I know that we talked about it and that you had arranged for Cole to see a counselor.  Is that right?

A.   He has been attending to see -- I mean he's been going to a counselor weekly since he's been at my home.

Q.   And you would be willing to make sure that that was continued?

A.   Absolutely.  I do think it was a great help to him, and I think it's a great help to anybody that goes to counseling.

Q.   Are there any other devices other than your Internet?  Do you have tablets?  Do you have gaming devices?  Do you have laptops and computers that can access the Internet?

A.   I have a school laptop and a school iPad that are locked down from AISD.  I mean they're -- I can't -- I can't even get on anything, you know, with the blocks that they have.

My TV is a DirecTV streaming, but I can take the TVs out, if necessary.  I mean I would be willing to do about anything.  And I have a Kindle that I read books on.

Q.   Well, if it were ordered that none of those things would be

allowed to be used by Cole because the Judge can set very severe

rules, do you have any problems with following those?

A.    Absolutely not.

Q.    It wouldn't interfere with your work.

A.    No, it would not.

        MS. McELROY:  I'll pass the witness, Your Honor.

        THE COURT:  You may proceed.

        MS. WOOLAM:  Thank you, Your Honor.

                    CROSS EXAMINATION

QUESTIONS BY MS. WOOLAM:

Q.    Ms. Underwood, when did the Defendant move into your

residence?

A.    After his parole on -- I mean his bond on -- I believe it

was April 25th.

Q.    And he has resided with you exclusively since April 25th of

2024?

A.    Yes.  And I'm not exactly sure if that's the date but it was

the day that he -- that they did the bond.

Q.    Okay, approximately.  I'll -- I'll hold you to that.  We

have a document in Government Exhibit 2 that says the exact date

that he was put on bond.

        Were you present at that -- the hearing that released him on

bond?

A.    I wasn't able to go into the courthouse but I was in

Perryton with him, yes.

Q.   Were you aware of his conditions of bond?

A.   Yes.

Q.   Were you aware that one of those conditions was that he have no contact with Jane Doe, no communications whatsoever?

A.   Yes, I was.

Q.   You were aware of that?

A.   (Affirmative gesture).

Q.   And are you -- Were you aware that he was continuing to communicate with Doe?

A.   Absolutely not.

Q.   So he hid that from you.

A.   Yes.

Q.   And he lied to you about those communications.

A.   Yes, he did.

Q.   Prior to him being in your residence, were you aware of his relationship and communications with 15-year-old Jane Doe?

A.   Up until the arrest, no.

Q.   When he was arrested, you became aware of that?

A.   Yes.

Q.   Did you ever ask him about the relationship?

A.   Yes, after -- after being arrested I did.

Q.   What did he tell you?

A.   He said he loved -- they loved each other.

Q.   Indicate he wanted to be with her forever?

A.   He hoped to, yes.

Q.   That he would potentially run away with her or marry her?

A.   He never said run away with her, but I believe that he just said that -- that he had prayed for a light, and she was -- He really genuinely thought that they were soulmates.

Q.   Has he told you anything about his interactions with Doe?

A.   Not a lot.  I'm his mom, and we don't -- I mean, you know, I didn't -- I didn't really want to know any really graphic details at all but just that they had a relationship, and he compared it to my in-laws were married at 15 and 27, and I explained to him, you know, that times have changed and he said, "Well, they were married for 58 years."

Q.   At the time your in-laws were married at 15 and 27, was there technology that allowed the sharing of sexually-explicit conduct?

A.   No, ma'am.  It was in the '60s.

Q.   So it is a different time, right?

A.   That's exactly what I told him.

Q.   When the Defendant -- To your knowledge and maybe now looking back, but when the Defendant began his relationship and communications with Doe, was he still married?

A.   No, not to my knowledge.

Q.   He had already filed for divorce or that separation process had happened?

A.   He -- He's been divorced since right after Christmas.  I'm not sure of the date.

Q.    Right after Christmas of 2023?

A.    2024.  '24.

Q.    2023?  This year is 2024.  So after Christmas, I guess ---

A.    He got divorced --

Q.    At the beginning of the year?

A.    -- at the beginning of the year, 2024.  I'm not sure of the actual date.

Q.    Okay.  I'm sorry.  I'm not trying to trick you or anything.

A.    No.  I don't -- No, I don't know.  I was honestly -- I don't know the actual date of their divorce.  I was just real happy that it happened.

Q.    Okay.  So if -- if facts indicated that he was, in fact, communicating and engaging in a sexual relationship or at least communications leading to a sexual relationship with Doe prior to Christmas of 2023, at that timeframe was he still married?

      And if that's confusing, I'm sorry.

A.    Yes, he was still married in 2023, December of 2023.

Q.    Okay.  What was -- During that timeframe prior to his divorce, what was Mr. Underwood's now ex-wife's position with Perryton ISD?

A.    I believe she's the Compliance Coordinator and Safety Director.  She's in charge of like watching the cameras, doing the door opening, making sure (inaudible) are followed through with the compliance that the state or federal grant depends on. They created the job for her when Cole got the job as a coach.

Q.   So if, in fact, there was communication and interactions between Mr. Underwood and this 15-year-old student during the timeframe in which he was still married, he was engaging in this activity under the direct watch of not only his spouse but the Compliance Coordinator and Safety Director of Perryton ISD.  Is that accurate?

A.   I would assume so.

Q.   Do you have Internet in your home?  You just talked about this, but you do have Internet in the home?

A.   I do.

Q.   And you mentioned the only devices in the home, I believe you said, are a tablet, maybe a computer given to you by your school district.  Is that accurate?

A.   I have a school district iPad.  I have a laptop that I use with my Cricket but I don't do anything with it.  I mean it just sits there.  And then I have an old hard drive that I haven't plugged in in forever that just has my kids' pictures from when digital photography went through, but those are the only devices that I have.  Oh, and my Kindle.  I have a Kindle.

Q.   And a Kindle.  Like many of us today, do you have a drawer, a box, a bag somewhere that just contains old phones that you've just not gotten rid of?

A.   The only -- The FBI, when they -- I have two old phones, I do.  They're in my -- But they're not connected to anything.  They don't have service.

Q.   Okay.  Are you aware that phones can be connected to the Internet even if they don't have a service plan attached to them?

A.   I'm -- I'm not aware of that, but they're so old.  One's split in two.  I just kept it on the off chance like if I ever dropped mine or something, I would have one that they might -- could fix again.

Q.   Any other phones or devices that as you're thinking through right now you realize could still be in the residence?

A.   Not that I know of.  I know my DirecTV is a streaming service.

Q.   Okay.  So the TV's connected to the Internet as well?

A.   I mean -- Yes, it's streaming.

Q.   Any scenario where there's a phone that -- that you could think got dropped or shuffled somewhere that you might be forgetting about?

A.   No.  It's -- It's -- I've lived alone for a long time.

Q.   And do you keep your house pretty organized?  Tidy?

A.   Extremely.

Q.   Okay.  So if -- if there was a phone that -- that you didn't know was tucked in a corner or something, that probably wouldn't happen because you know -- the arrangement of your house, you know where everything is.  Is that fair?

A.   Absolutely.

Q.   So no -- Just -- No scenario where there's just a misplaced phone or device.

A.   Well, I -- I don't think that there is but I don't know.  I know the two that I have that are old, I know exactly where they're at.  They're in my bathroom on a -- on a carousel in my bathroom with my vitamins.

Q.   Okay.  A minute ago you said that you aren't aware that you can just use a phone to connect to the Internet.

A.   Oh, no.  I know you can use a phone to connect to the Internet.  Like my phone?

Q.   No; a phone that doesn't have service.

A.   Oh.

Q.   I apologize.  Maybe I misunderstood your answer to my question.

A.   Okay.

Q.   When I asked about using an old phone that doesn't have service to connect to the Internet, I thought you said you didn't know that one could do that.

A.   Oh, I really thought that they just -- just didn't work, period, to be ---

Q.   Okay.

A.   I didn't think that -- When they didn't have service and it wasn't on a plan, they just did not work.

Q.   Okay.  Are you -- What is -- What is your level of computer savvy you would say on a scale of 1 to 10?

A.   Well, this would be a very embarrassing question.  Although I'm in education, I'm terribly tech unsavvy.  So probably about a

4 or a 5.

Q.    I don't think that's embarrassing.  I think a lot of us are probably not as computer savvy as we'd like to be in 2024.

Do you use Snapchat?

A.    I do not.

Q.    TikTok?

A.    No, I do not.

Q.    Have you ever downloaded the application or sent messages on Signal?

A.    Never.

Q.    Do you use any social media platforms at all?

A.    Facebook and Instagram, but I deleted it the day all of this happened just so I didn't have to talk to a lot of people.

Q.    So you don't monitor anything on the social media side of things.

A.    No, not right now.

Q.    Ma'am, do you drink alcohol or use drugs?

A.    Occasionally drink alcohol if I just go out with my friends but not on a daily basis or anything.

Q.    Based on that answer, I assume it's fair to assume you don't use drugs.

A.    Correct.  I'm sorry.  Yes.

Q.    Okay.  Do you have any criminal history?

A.    I do not.

Q.    Were you aware of the allegations of inappropriate

communications with students at Amarillo High School?

A.    I was aware he was put on administrative leave and immediately cleared.

Q.    And you're saying you didn't know about the relationship with Doe and his sexual advances towards Doe until his arrest. Is that accurate?

A.    That's accurate.

Q.    Did you -- How often did you speak to your son prior to him, I guess, moving into your house?

A.    Every day or most every day.  We're very close.

Q.    Are you aware that the school spoke to him and -- and law enforcement spoke to him prior to his arrest?

A.    I was.

Q.    So he had told you about them speaking to him?

A.    He had, and he just said he thought it was because Stacy, his ex-wife, had caused some problems for him.  I sat at a football game with Mr. Brown, the Superintendent, in November and Mr. Brown only had wonderful, glowing things to say about what an upstanding young man Cole was.

Q.    Okay.  So it's fair to say he lied to you about what law enforcement told him prior to his arrest or spoke to him about prior to his arrest?

A.    I don't think he lied because we didn't speak of it.

Q.    Okay.  I'm sorry if I'm confused.  I thought a second ago you said he told you that law enforcement spoke to him.

A.   He told me Mr. Brown had spoken to him, the School Superintendent.

Q.   Okay.  But he didn't tell you when the Ochiltree County Sheriff's Office spoke to him and when he was put on administrative leave or some form of leave just prior to his arrest.  Is that fair?

A.   All of that happened -- and I'm making up the -- I'm going to say it was on a Monday.  He told people he was put on administrative leave, and he was like, "But it's bogus.  It's not true," and they arrested him on Tuesday.  So it happened in very short order.

Q.   Okay.  So even though it was very short order, he said to you, "It's bogus and it's not true," and then he was arrested.  So he -- he lied to you about the nature of the relationship and the sexual advances.  Is that fair to say?

A.   That's fair.

Q.   Ma'am, what is your -- I guess Mr. Underwood's immediate family dynamic?

A.   He has his father and I, his sister Claire.  I have -- Billy's an only child, my husband, my ex-husband, and so that side of immediate family is not -- both of his parents have passed.

My mother is still living in Channing.  My father passed 17 years ago.  I have three sisters and a brother and then lots of nieces and nephews.

Q.   How much younger is Claire than Mr. Underwood?

A.   Three years.

Q.   And he doesn't have any other siblings.  Is that correct?

A.   That's correct.

Q.   On Direct Examination you talked about your cooperation in the investigation, right?

A.   Yes.

Q.   Now it's -- it's accurate that Mr. Underwood actually told the FBI where certain devices were in his home and that they could go get them, correct, to your knowledge?

A.   I -- I know that the agent called and asked, yes.

Q.   And you actually told the agent, "no," he wasn't allowed to come into the house.  Is that correct?

A.   I called our State's Attorney, Donna Hathaway.  I've never had a legal dealing in my life, and I just wanted to make sure I wasn't doing anything I shouldn't have done that would harm -- you know, that would do anything to the case.

Q.   Okay.  And that's fair.  You're -- You're allowed to consult with counsel.  But just to -- to understand the nature of your cooperation with law enforcement, you actually required the FBI get a search warrant for your residence to be able to enter.  Is that correct?

A.   Yes.

Q.   And during the course of that search warrant, your -- I believe you said your sister was a -- is a private investigator?

Is that the correct relationship?

A.    Yes.

Q.    You and your sister were both on scene when the FBI was searching the residence.

A.    Yes.

Q.    Is that right?

A.    They followed us home from this hearing last Wednesday.

Q.    Okay.  And during the search, was your sister filming the FBI searching the residence?

A.    No, not to my knowledge.

Q.    Were you all asking for documentation and paperwork?

A.    We did.

Q.    You stated, I believe, that you placed items out for the FBI to collect.  Is that fair?

A.    Yes, that's fair.

Q.    What items did you put out for the FBI to collect?

A.    The -- His laptop, his iPad, his -- I didn't put the Apple watch because I didn't even really realize he had one on his arm, and then his PlayStation and his -- the games were on the table in his bedroom --

Q.    Okay.

A.    -- in clear sight.

Q.    Do you remember talking to -- prior to that to -- to the FBI agent, Special Agent Nate Newland that testified here today about them coming over and you putting out those devices?

A.    (Affirmative gesture).

Q.    Do you remember telling him that you were also going to place Mr. Underwood's cell phone out for them to collect?

A.    I didn't have his cell phone.  He -- When they arrested him that day, he had his cell phone on him.

Q.    Okay.  So ---

A.    So I didn't say anything about a cell phone to my knowledge. I've been so rattled but I knew he had the cell phone with him that day because I told the APD officer that drove Cole's car home for me because they arrested him and I had no way to get it home, I said, "Oh, should I get his cell phone?"  And he said, "Oh, no.  They'll take his cell phone."  So that -- that was the only conversation about his cell phone.

Q.    So it's your testimony that you did not discuss Mr. Underwood's cell phone and putting out his cell phone with the FBI agent when they were talking about coming to search your residence.

A.    Not to my knowledge because I knew they had his, so I don't know why I would say that.  I don't believe I said that.

Q.    And it's your testimony that there wasn't a cell phone that Mr. Underwood was using that was in that residence.

A.    No.  And, in fact, when the Agent was talking earlier and said he had -- he had gotten a new cell phone, I -- I didn't realize that.  The only cell phone I had seen him have since he was with me was that one.  He changed his number but it was the

same cell phone.

Q.   I want to make sure I'm understanding.  When you say "that one," the cell phone that he had on him when he was arrested was the same cell phone you've always known him to have?

A.   That I had seen, yes, since he had lived with me.  And I just know that just so he didn't get heckling phone calls and everything else.  He had -- He had set it up with Verizon.  He was like "I didn't even know I could do that" which I -- and I'm tech -- I'm an idiot when it comes to technology.  I didn't know you could just call and go, "I need my cell phone number changed."  So they did it on the same cell phone to my knowledge.

Q.   So it's -- it's your testimony that you've never seen the Defendant, since he's moved in with you, with another or different cell phone.

A.   No, ma'am.

Q.   So you wouldn't have done something with a cell phone of his to try to hide evidence in this investigation.

A.   Absolutely not.  I love him with all my heart, but I -- I wouldn't do something illegal for him.

Q.   Okay.  Are you aware of the Defendant sexually abusing any of his family members?

A.   Absolutely he has not.

Q.   Okay.  Did you ever have any communications with him on a phone that would indicate such?

A.   There's been talk about -- and -- and my daughter Claire has

said that they played "Doctor" when they were -- when she was 11 and he was 14.  So we've had talks about playing "Doctor."  We all played "Doctor" when we were younger with cousins and siblings and that sort of thing.

Q.   What does play "Doctor" in this context mean?

A.   I'm assuming just, you know, experimenting like children do when you're 8, 9, 10, 11, 12, that sort of thing.

Q.   Like sexual experimentation?

A.   (Affirmative gesture).

Q.   Okay.

A.   Not having sex.  Just seeing, you know.  And even in the school district, we have students all the time.  It's kind of like "You show me yours, I'll show you mine," that sort of thing that little kids do.

Q.   So is it your understanding that Mr. Underwood engaged in sexual experimentation with an individual that was three years younger than him?

A.   I think they both did as -- when they were children, but both were children.

        MS. WOOLAM:  Thank you, Ms. Underwood.  I don't have any other questions for you.

                    REDIRECT EXAMINATION

QUESTIONS BY MS. MCELROY:

Q.   Are there any kind of dangerous weapons in your home that anyone would be concerned about?

A.    No, ma'am.

Q.    Do you have any opposition to opening your home to Probation should they decide they needed to come and visit and inspect, preview either phone or Internet service, any of those things?

A.    No.

Q.    Do you have any objection to that?

A.    They could come at any time.

        MS. McELROY:  I have nothing further of the witness, Your Honor.

        THE COURT:  All right.  Anything further from the Government?

        MS. WOOLAM:  No, Your Honor.

        THE COURT:  All right.  Thank you, Ms. Underwood.  You may step down.

        MS. McELROY:  Your Honor, I have no further live witnesses, only proffer in regards to the detention issue.

        THE COURT:  All right.  You may proceed.

        MS. McELROY:  Should I proceed now?

        THE COURT:  Yes.

        MS. McELROY:  Okay.  Your Honor, my client's mother, who you just heard testify at this hearing in Amarillo, she has for a number of years act -- acted as an AISD teacher and in Perryton as well.  She has no criminal history.  She has no substance abuse problems, Your Honor.

        While she may not be tech -- tech savvy, there is no

reasonable problem with allowing Probation to check to see what is there, what operates and what does not, to satisfy any restrictions that the Court may set.

In regards to that, Your Honor, I would ask that Defendant's Exhibit B, which we ask to be admitted under seal, be considered by this Court.

We would start with the bases of that to say that while we understand that the allegation under 18 United States Code Section 2422(b) is a serious one, it is not listed as ineligible for supervised release.

We are here and you are here to determine whether or not there are under the Bail Reform Act circumstances and conditions by which his flight risk and any type of harm to the community can be curbed, necessitated, or dealt with by a various number of conditions that are available.  Those conditions can include:

Not having a phone at all, limiting a phone to only basic phone line flip phones so that there's no Internet access, no app access, no encryption access, no photograph access;

GPS leg monitoring;

Requiring that any pass -- any Wi-Fi be password protected within the home.  If that's not possible, then my client's mother has indicated she is fine with shutting down the Internet service entirely.

The client has the ability to maintain work and do

something productive and occupy one's time by going to work in the warehouse, Your Honor, where he can make some money but he will not have contact with minors.

We are fully aware of this Court's ability to restrict any type of contact from schools, arcades, parks, pools, playgrounds or anyplace where minors might gather, Your Honor.

We are fully aware of the Court's ability to in place a curfew, to require medical or psychiatric treatments, to limit or restrict travel, and for any testing for substance abuse or alcohol, Your Honor.

I believe that his mother is very aware of the seriousness of this allegation as is his aunt and the rest of his family.  They are very aware that any -- any violation or any kind of problem will result in his return or denial of any release.

Your Honor, as far as a flight risk goes, there just doesn't exist a real flight risk in this case.  We don't have a passport.  We don't have ties to any other jurisdiction, and we don't have any visitation in any other country.  All of his relatives are basically here within the Panhandle.  There are no episodes or arrests for escape.  There is no bond jumping involved.

We would ask that the Court set those restrictions as restrictive as they believe is necessary.  And I believe, Your Honor, that those restrictions can do both of the objectives

which have been set out by the Bail Reform Act, and that is that

he will return for court and that he will not present himself as

a danger to the community.

Thank you, Your Honor.

THE COURT:  Thank you.

We'll proceed to argument.  Would the Government like

to make argument?

MS. WOOLAM:  Yes, Your Honor.

Your Honor, I begin by noting that this is a rebuttable

presumption case because this is a qualifying offense involving a

minor victim.  The -- The rebuttable presumption begins with:

There is no condition or set of conditions that could protect the

community.

Just going through the detention factors pursuant to 18

USC 3142(g), Your Honor, the nature and circumstances of the

offense charged, this is a crime of violence.  Sexual offenses,

enticement of a minor being an offense against a child, is

considered a crime of violence.  It's also a crime that involves

a minor victim.  So the nature and circumstances of the offense

are such that detention would be presumed warranted.

The weight of the evidence against the person is -- I

hope the Court has understood here today and based on Government

Exhibits 1 and 2 -- is incredibly strong.  There are several

electronic devices that have revealed communications on several

different platforms -- Snapchat, TikTok and Signal -- that show

the communication, grooming and sexual nature of the relationship between Mr. Underwood and this 15-year-old child.  It was also testified that he used Snapchat to specifically arrange the sexual encounters with this child.

In addition to that, the child has -- has spoken to law enforcement about the nature of the relationship, and Mr. Underwood himself has admitted to law enforcement about his sexual encounters with this child.  He's further continued to maintain that he loves this child.  So the weight of Mr. Underwood is incredibly strong in this particular case, and that is a factor that would weigh against him in detention.

Just touching on a few of the history and characteristics as spelled out by the detention factors, we will note that the Defendant, of course, does have family ties.  His mother has testified that she would be a third-party custodian. The Government's position is that she would not be a proper third-party custodian.  She would not be capable of monitoring him such that he would not be a flight risk or continue in the criminal activity that he has committed himself so hard to continuing in.

Specifically, the Defendant engaged in this same communication and conduct with this minor child and even met her to provide her a secret cell phone while he was living with his mother after he was released on bond and those bond conditions were set saying he could not have any communication with her.

Further, Mrs. Underwood admitted that the Defendant has lied to her.  He has hid things from her and that she is not very technologically savvy.  She does not use Snapchat, TikTok, Signal or any social media.  So she would not even know necessarily what to look for or how to look for it.  She was not aware that you could just take an old cell phone that doesn't have service and connect it to a Wi-Fi account.  I think there is -- there's not a situation where the Defendant, who has proven that he will do anything he possibly can to continue his relationship with this child, there's -- there's nothing that this mother would be able to do to stop that or locate that or turn him in because he simply is going to continue doing it behind her back, under her eyes, in whatever situation he possibly can.  So we do not believe that she is a suitable third-party custodian in this case.

Furthermore, and back to the family ties, we'll note that Special Agent Newland testified that his understanding was the Defendant's sister does not have contact with the Defendant. He has relatively limited family ties after that, being his mother and his father and some of the more extended family, but he does not have kids.  I would argue this weighs against the Defendant.  He is not somebody that has an incredibly large network of individuals here to keep him here.  He is divorced from his wife.  And there's indication, as testified to throughout this case and is clearly plain in Government Exhibit

2, that the person he is most tied to is this child victim who he wants to essentially run away with.  I think that's indicative of a flight risk and a continued danger to the community and to this victim.

Just touching on again family members, the reason that I bring up and mention the Defendant's ex-wife is -- is not to put any blame or place any fault on her.  It's simply to show that the Defendant's actions in hiding this secret relationship were so extensive that even his -- his wife, his companion at the time, the person with whom he presumably shared a house and a life, who was the Compliance Coordinator and Safety Officer for Perryton ISD, was unaware that this relationship was going on because the Defendant was taking such great lengths to hide the relationship from even her and everyone else.  That shows what level this Defendant will go to to hide his criminal actions.

In terms of past conduct, I believe this is what heavily weighs in fair of detention.  The Defendant here has a proven history of violating every single order given to him.  The school ordered the Defendant not to have any contact with Jane Doe and he continued that contact and engaged in a sexual relationship with her.

He was then arrested by Ochiltree County, and he was given a condition of bond.  It's in writing in Government Exhibit 2 that stated he would have no contact or communication with Jane Doe.  And after he was bonded out and moved into his

mother's residence, he still communicated with her. He met her in person to give her this secret cell phone, and he switched over to using the Signal platform to message her so it would be encrypted and disappear and believably, under his eyes, not something that law enforcement would locate.

His past conduct shows that he will violate any and every single order given to him and that there is no condition or set of conditions that this Court can impose that would cause any different result than what he's already proven he will do which is continue his criminal plan and action with Jane Doe.

I would say that that ties to the conditions discussed on record concerning appearance at court proceedings. While it doesn't appear that he's missed any court proceedings, violating one's bond conditions is -- is heavily in favor of detention. That conduct alone, while Ochiltree County has not revoked his bond, could be grounds for them doing so. The federal case here has, obviously, taken precedent on that.

Also, it has been testified to that he has had continued communication with Jane Doe after that bond condition was put in place. Thus, he was on release, pending his state trial, when he continued to commit this criminal offense which weighs in favor of detention.

And I'll just note as evidence of the type of communication he had with Jane Doe after his arrest by Ochiltree County, Pages 56 and 57 of Government's Exhibit No. 2 are the

Signal messages or a screenshot of some -- of a Signal message sent from the Defendant to Jane Doe on May 18th after he was bonded out where he discusses in great detail that the first time he saw her and fell in love with her was when she was in junior high school and that from then on, he knew he had to have her and he would essentially do everything to get her.

The Defendant has proven that he should not be released on bond.  The nature and seriousness of the danger to any person or to the community are great.  The Defendant has proven that he will engage in a sexual relationship with a 15-year-old child at any and all costs, and the discussions about running away together or even her saying she would do so pose such a significant danger to that child alone that it isn't worth even allowing the possible opportunity to give Mr. Underwood the chance to do that.

We believe that any condition or set of conditions that this Court could even creatively come up with would not be sufficient to protect the community or this child or prevent the Defendant from being a flight risk.  And for all of those reasons, we ask the Court to continue the Defendant's detention pending his trial.

Thank you, Your Honor.

THE COURT:  Argument from the Defense.

MS. McELROY:  Your Honor, it's Defense position that there are, indeed, conditions that the Judge can set that will

ensure both his appearance at trial and the community safety.

All of the lying is out and above here. The complaining witness victim is 15 and is in Perryton. All of the eyes are on these folks, eyes from parents, eyes from teachers, eyes from other parents, eyes from Probation, GPS monitors, disallowing communications, shutting down those avenues, Your Honor, of the secrecy. Things have been brought to light. And with those things being brought to the light, they are not going to be successful in -- in running. Nobody is going to have the opportunity to make the same types of mistakes that have been made here, Your Honor.

This young lady, to my knowledge, is not able to drive. A restriction on GPS monitor would let us know quite quickly whether or not he's left the area.

There are ways to ensure him to appear, Your Honor. And while his mother isn't tech savvy, she is a person that has been a person who's followed the rules and is a person who's willing to let this Court know if her son is not following the Court's rules.

For those reasons, Your Honor, we believe that the conditions of release should be set by the Court.

Thank you.

THE COURT: Mr. Underwood, would you please stand for the ruling by the Court?

We have two matters that the Court was to consider

today.  One is the Preliminary Examination and the other is the Motion to Detain.

With regard to the Preliminary Examination, the Court finds that there is probable cause with respect to the offense charged in the Complaint, and the case will be bound over for presentation to a Grand Jury.

With respect to the Motion to Detain, first of all, this is what is called a "presumption case," meaning that there is in place a presumption that you would be a flight risk and that you would be a danger to any one person or to the community, and that is because of the type of case it is, that involving a child victim.

That does not mean the presumption can't be rebutted. You can rebut that presumption through what has been offered and argued at the hearing.  However, the considerations of flight risk and dangerousness never go away.  It just means that perhaps the presumption has been rebutted.

As the Court looks at the flight and dangerousness, Congress instructs us under the Bail Reform Act to look at four main considerations.  Under each consideration then there are subfactors.  Some of these can become repetitive and some evidence can go to multiple factors or multiple subfactors.  I'll try not to be too repetitive, although some of the evidence, as I said, may go to multiple factors or subfactors.

I also will say we've had a fairly lengthy hearing with

about two hours' worth of evidence and argument. And so as I dictate my findings into the record, certainly I will let the evidence speak for itself in terms of if I happen to overlook anything that would support my decision. There will be a full record there in case either side wanted to appeal my decision. And so simply because I do not mention something does not mean it was not considered. Everything was considered, but I can't go back through a whole two hours' worth of testimony in reciting my ruling.

The first thing we look at is what is called "the nature and circumstances of the offense" charged. Congress gives us a list of various types of offenses that we can consider which put it in the presumption category. And as I said earlier, because this is an offense that involves a minor victim, it is something that the Court can consider and what puts it into the presumption category.

Second, we look at the weight of the evidence in the case with respect to flight and also with respect to dangerousness. With respect to flight, the Court recognizes that you are from the general Texas Panhandle area. You have family here. Your jobs have been in and around this area. And while it seems like maybe on your father's side your family is smaller, it sounds like on your mom's side of the family, there's quite a bit of extended family. So that has been argued each way by both sides, but you do have family in the area.

You do not have a passport and you haven't traveled outside of the country, as I recall the evidence. But as was recited by the Assistant U.S. Attorney during her proffer, if there is a conviction on this offense and/or if other offenses are added, the penalties that you could face are very severe which does weigh in favor of a flight risk. And the Court is entitled to look at that in terms of evaluating flight in terms of what the penalty is that one might face if there happened to be a conviction.

With respect to dangerousness, we do have a 15-year-old victim. There is testimony that while no other victims have been -- I don't know if "identified" is the right word or if I'm mischaracterizing the Agent's testimony, but it appears that at least there is still investigation ongoing as to whether there would be other victims. But while the Court recognizes that the AISD investigation, while you were a coach there, resulted in no discipline from the school district, there was at least some concern to put you on administrative leave and to investigate it, and the former volleyball coach there had her own concerns, was concerned enough to report that to administration and to instruct her players, I think, not to stay after hours and those other things that were testified to by the Agent.

With respect to the minor victim, Jane Doe, there, it seems, were many text messages, many exchanges. I don't know if all of them are contained within the exhibit, but it appears that

there are many.  And then it also appears that there is an admission from both her and you that there was a sexual relationship that took place over the course of these months as these messages were being exchanged.

After the first arrest, the contact did not stop.  Instead, it changed, if you will, in terms of the platform and the method that was used to one that, I believe, is called "Signal" which has the end-to-end encryption which is arguably meant to keep things hidden or to keep things secret.

The Agent testified that his opinion, after spending time with the minor victim, is that she is in a place where maybe she is trying to move forward but at least once has been pulled backwards after the original state court arrest, and he has some concern, based on his training and experience, that it might be difficult for her to move forward if there were continued contact.

I'll move now to the third category, although I think some of the things that I will recite here probably also could be looked at in terms of dangerousness.

We look first at the person's character, and there's a wide range of evidence there.  You apparently did well at school.  You've been commended by employers.  On the other hand, we have this relationship which, I believe, you even acknowledged in your interviews may have been inappropriate in terms of being with a student and being with a 15-year-old minor.

We've already gone over the family ties.

Employment, you do not have the employment that you had when this incident took place but you have quickly found other employment, and that employment still would be available to you. And as the Court understands it, you would be working at a warehouse with other adults where there would not be a concern as to minors being there.

With respect to financial resources, you do have a job, but it appears that -- that -- it may be in the documents, but that whatever the bond was that was set in Ochiltree County, your mom had to help you with coming up with the money for that bond and you were not able to do that on your own.

We've already talked about length of residence in the community. We've talked about community ties.

With respect to past conduct, there is no criminal history but there is a concerning pattern of conduct with respect to the minor victim. And one of the things that concerns the Court the most is not following the first set of conditions that the judge in Ochiltree County set for you which said no contact with the minor victim. And instead of having no contact, you continued that contact and continued it in a way so that it was harder for people to detect. Snapchat was no longer used. TikTok was used. The Signal app with the end-to-end encryption was used. I'm not sure if you got a second phone or if you simply changed your phone number. That testimony was not

completely clear to the Court, but what was clear to the Court is that you gave a different phone to the minor victim and she was using that phone, understanding or knowing that there probably was a possibility her parents were looking at her original phone and/or that that phone had been given to the authorities.

There is not a history of drug or alcohol abuse.

There's not criminal history. Therefore, there's not a record concerning appearance or flight from other court proceedings because while the criminal charges are pending in state court, as they are here, you are innocent until you're proven guilty. So there's no history. There are simply pending charges at the current moment.

We also look at whether at the time of this offense or arrest you were on probation, parole or other release pending trial. As I said before, what we are looking for or at least what is important to me is: Has another judge put a set of rules out there and have you followed those rules? Past behavior is a good indicator of future behavior in my opinion, and you have not followed those rules from Ochiltree County. And so I don't have a lot of confidence that you would follow my rules. And I understand that I can enforce some pretty strict conditions, but you have shown the ability to not only break rules but to break them in a creative and a secretive way.

Finally, we look again at the nature and the seriousness of the danger to any person or to the community.

While we do not have any other victims other than Jane Doe at the current time, one victim is enough. And there certainly is some concerning behavior at least in some people's eyes with respect to your employment at AISD and how some things happened there.

And there also was a mention by the Agent that based on his training and experience and what he has seen in this case, that because of what you have heard at court today with respect to the minor victim trying to move on, being glad that she is free from this, not believing that she had fallen for this more than once, I have some concern for your own safety as the Agent said that he did, and I'm entitled to look at that as I read the cases in terms of keeping people safe. It's not only the minor victim but it also can be the person in front of me. And I don't want to go back and recite all of the evidence that we've heard in terms of the relationship and how it unfolded.

I will just finish by saying: In the Court's opinion, you have not rebutted the presumption of flight and you have not rebutted the presumption of dangerousness. And for those reasons, the Government's Motion to Detain will be granted, and you will be kept in custody during the pendency of your case, Mr. Underwood.

Is there anything further from either counsel?

MS. WOOLAM: No, Your Honor. Thank you.

MS. McELROY: Nothing further, Your Honor.

THE COURT: All right. We will take about just a

five-minute recess because I know we need to move on to the next case.

COURT SECURITY OFFICER:  All rise.

(Hearing adjourned at 4:13 PM.)

CERTIFICATE OF OFFICIAL REPORTER


I, Deborah A. Kriegshauser, Federal Official Realtime Court Reporter, in and for the United States District Court for the Northern District of Texas, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the electronically-recorded proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 27th day of March, 2025.


/s/ Deborah A. Kriegshauser

_____

DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER